## NATIONAL TUNNEL & MINES CO. v. INDUSTRIAL COMMISSION et al.

No. 6119.   Decided May 11, 1940.   (102 P. 2d 508.)

*Van Cott, Riter & Farnsworth, B. R. Howell,* and *Guy S. Anderson, Jr.,* all of Salt Lake City, for plaintiff.

*Joseph Chez,* Atty. Gen., *S. D. Huffaker,* Asst. Atty. Gen., and *A. N. Ferro,* of Salt Lake City, for defendants.

MOFFAT, Chief Justice.

Alton Hartle, claimant, filed with the Unemployment Compensation Division of the Industrial Commission of Utah commission on the 12th day of September, 1938, a claim for "benefits," alleging he was a miner, that his last employment was mining, that he voluntarily terminated the employment because a change of contract made it impossible to make a living wage and that he was in the employ of the National Tunnel Mines Company at Bingham, Utah, from January 1, 1937, to June 1, 1938.

The commission requested from the National Tunnel & Mines Company, company, a Wage and Separation Report" on September 17, 1938, covering the period of January 1, 1937, to June 1, 1938, during which time Hartle claimed he was in the employ of the company. No report was filed. A "Final Notice and Demand for Wage and Separation Report" was dated and mailed to the company on September 26, 1938. Counsel for the company called counsel for the commission on September 29, 1938, and advised that Hartle was a lessee.

E. C. Howe, "Chief, Claims and Benefits," addressed a "Claims for Benefits" report to Harold D. Ellis, Unemployment Compensation Representative, Salt Lake City, Utah, which read:

"Re: Alton Hartle
"SS  *  528—18—4827
"You have been mailed an initial determination for the above named claimant which shows this claimant to be ineligible for benefits because of insufficient earnings in covered employment. The National Tunnel and Mines Company for whom this claimant worked has informed us that this man was a lessee and was not an employee of the company. Since there is a question as to whether or not the type of services which this man performed should be classed as employment under the Utah Unemployment Compensation Law we suggest that this claimant be informed of his right to appeal this case before the Appeal Tribunal of the Utah Unemployment Compensation Division.

"Will you kindly arrange to handle this matter accordingly and advise this office."

Claimant then filed an "Appeal and Request for Hearing on Claim for Unemployment Compensation Benefits," dated October 3, 1938, with the commission and alleged therein: "My relationship with the National Tunnel & Mines Company and the Utah-Delaware Mining Company was that of an employee and not that of an 'independent contractor' as stated by them."

The following "Inter-Office Communication" followed:

"October 3, 1938

"Subject: Hartle, Alton
　"To: Mr. E. C. Howe, Chief Claims & Benefit Dept.
　"From: Harold D. Ellis

"Attention: M. O. Cox
　"With reference to your inter-office communication of October 1, please be advised that the above named claimant completed a form UC 617 'Appeal and Request for Hearing on Claim for Unemployment Compensation Benefits' which has been transmitted through the usual channels.

"/s/ Harold D. Ellis
"Sr. UC Representative"

The record contains unsigned documents purporting to be "Notice of Appeal and Hearing." A hearing was held on November 14, 1938, at 10 o'clock, in the forenoon. Floyd T. Atkin, Appeals Examiner, conducted the hearing. The claimant was present and the National Tunnel & Mines Company, plaintiff herein, was represented by counsel and H. D. Hunter, cashier of National Tunnel & Mines Company.

(Counsel for the plaintiff mention the fact that the claimant and the appeals tribunal were already discussing the question when they arrived. No objection was taken, it was not stated that this was prior to the time set for the hearing or if counsel were late for the hearing. This raises an implication but not having any more facts than here given, we do not find that there is any basis for any action on our part as to any implication).

The basis of the relationship between Hartle and the plaintiff is a "lease" executed on the 1st day of January, 1937,

for a period of six months with the Utah-Delaware Mining Company, a "lease" executed on the 1st day of April, 1938, to expire on September 30th, 1938, and a Supplemental Contract executed on the 1st day of April, 1938, with the National Tunnel & Mines Company, which company took over the Utah-Delaware Mining Company.

The lease executed January 1, 1937, provided that the plaintiff does "hereby grant, demise and let unto said Lessee that portion of the Company's mining property situated * * *." The lease further provided that the lessee is to have and hold said demised premises and lessee covenants and agrees to work same in good and miner-like fashion and in a manner necessary to good and economical mining, to supervise the work personally, to assist in the performance thereof and not to employ or bring upon said premises any persons objectionable to the lessor, to work said premises with at least two men each day except Sundays and holidays and any failure to do so for three days in any one calendar month shall work a forfeiture of this lease without notice, to allow to remain on the leased ground and to revert to the company at the termination of the lease, all track, pipe, chutes, timber, additions, improvements or supplies such as explosives and tools, to assume all responsibility for personal injuries to or the death of said lessee or any of said lessee's employees in or upon the property, said ores are to be delivered to the International Smelting Company and the lessee may have a representative present at the samplings. Lessee agrees not to sublease, without consent, to pay for the tramming, smelting and handling charges, all costs, attorney's fees and expenses incurred in enforcing the covenants of the lease.

Some of the foregoing provisions might signify elements of a closer relationship than that of lessor and lessee. These are the standard provisions of a mining lease. The element of control is limited to the fact that the work must be performed in a "good and miner-like fashion." The supervision is left to the lessee.

Other covenants made by the lessee, as provided in the
lease are:

"Not to obstruct the main openings in any manner whatsoever.
To stow no waste underground except with the consent and under
the direction of the agents of said Company.

"The Company acting through its agent or agents shall be the sole
judge as to whether ore mined by Lessee can profitably be immed-
iately shipped as direct smelting ore.

"It is expressly understood and agreed that said *Company reserves
the property and the right of property in and to all ores extracted
from said demised premises during the term of this lease. All ship-
ments of ore shall be made* by said Lessee *in the name* of said *Com-
pany* account of this lease, and all payments for such shipments of
ore shall be made to said Company account of this lease. (Italics
added.)

"Lessee shall be subject to the orders of the Company's agents as
to the use of cars, drifts, blacksmith shop and ore bins.

"Lessee will promptly comply with and obey all rules, ordinances
and law made by all legally constituted and/or appointed authorities
in any way affecting said demised premises or operation thereof
and will comply with all rules and regulations of insurance compan-
ies."

In the lease executed April 1, 1938, the lessee agrees,
inter alia:

"To do or cause to be done not less than 3 8-hour shifts of work
per day excepting only those days when said Company is not carry-
ing on operations in its said mine; * * * to adopt the same time
for commencement and ending of each shift as is adopted by the Com-
pany in its work; to accurately observe the time when each person
working on said demised premises commences and ends each shift's
work and to make or cause to be made a written record thereof which
the Company shall at all times have the right to examine; to adopt
and enforce the same rules and regulations with respect to Lessee's
employees as those adopted by the Company with reference to Com-
pany employees, to comply with all rules, regulations and require-
ments deemed desirable by the Company for its convenience and that
of its employees and lessees or by it deemed necessary or desirable
in the interest of health or safety; to at all times allow Company
agents to enter upon said demised premises and to inspect same,

make surveys thereof, or take samples of ore or other materials therein * * *

"It is mutually understood and agreed that the title in and to all ores extracted from the demised premises shall at all times remain in the Company and that the same shall be shipped in the name of and sold by the Company to International Smelting and Refining Company pursuant to the terms and conditions of the contract then existing between the Company and said International Smelting and Refining Company and that the proceeds from the sale of such ore shall be received and distributed by the Company in the manner herein Specified."

The supplemental agreement simply provided that the plaintiff might deduct an additional two per cent of the ore values to protect them against the fluctuation of taxes.

(The Unemployment Compensation Act, Chapter 1, Laws Utah 1936, Special Session, as amended by Chapter 43, Laws Utah 1937, provides that

"No agreement by an individual in the employ of any person or concern to pay all or any portion of [the tax] * * * shall be valid." Section 15, Chapter 1, Laws Utah 1936, Special Session).

We shall hereafter set forth the contention of counsel for the plaintiff under five headings.

1. "The Unemployment Compensation Act makes no provision for an appeal by the claimant from the determination of ineligibility by the deputy."

Section 6, Chapter 43, Laws Utah 1937, Paragraph (b) reads:

"*A deputy or representative designated by the commission*, and hereinafter referred to as a deputy, *shall promptly examine the claim and, on the basis of the facts found by him, shall either determine whether or not such claim is valid*, and, if valid, the week with respect to which benefits shall commence, the weekly benefit amount payable, and the maximum duration thereof, *or refer such claim to an appeal tribunal*, which shall make its decisions with respect thereto in accordance with the procedure prescribed in subsection (c) of this section, *except that in any case in which the payment or denial of benefits will be determined by the provisions of section 5(d) of*

*this act, the deputy shall promptly transmit his full findings of fact with respect to that subsection to the commission which,* on the basis of evidence submitted and such additional evidence as it may require, *shall affirm, modify, or set aside such findings of fact, and transmit to the deputy a decision upon the issues involved under that subsection which shall be deemed to be the decision of the deputy.* HE SHALL PROMPTLY NOTIFY THE CLAIMANT AND ANY OTHER INTERESTED PARTY OF THE DECISION AND THE REASONS THEREFOR. Unless the claimant or any such interested party within five calendar days after the delivery of such notification or within seven calendar days after such notification was mailed to his last known address, files an appeal from such decision and applies for a hearing, SUCH DECISION SHALL BE FINAL AND BENEFITS SHALL BE PAID OR DENIED IN ACCORDANCE THEREWITH. If an appeal is duly filed, the payment of any benefits with respect to the period prior to the final decision of the commission, shall be made only after such decision; provided, that if an appeal tribunal affirms a decision of a deputy, or the commission affirms a decision of an appeal tribunal, allowing benefits, such benefits shall be paid regardless of any appeal which may thereafter be taken, but if such decision is finally reversed, no employer's account shall be charged with benefits so paid." (Italics and caps. added.)

The deputy is to make a finding based upon the facts found by him, or to refer such claim to an appeal tribunal. But in the case where the payment or denial of benefits will be affected by the provisions of section 5(d) relative to strikes, he shall refer the claim to the commission who shall affirm, modify or set aside his findings upon the issues involved *under that subsection* which shall be deemed to be the decision of the deputy.

The only decision at this stage of the proceedings which the commission is to make is relative to section 5(d) and the decision of the commission relative to such subsection shall be the decision of the deputy. The next sentence reads:

"He [the deputy] shall promptly notify the claimant and any other interested party of the decision and the reasons therefor."

It is contended by plaintiff that the decision referred to is the decision of the commission relative to subsection 5(d)

only. The interest of the claimant, however, would be an interest in the whole determination, that of the commission relative to section 5(d) plus that of the deputy relative to the findings he has made as to the relationship existing between the employing unit and the claimant. To say that the decision of the commission relative to the determination made under section 5(d) is all that is to be in the notification sent the claimant is untenable. The commission determination is only part of the decision and when it is coupled with the findings of the deputy upon the relationship between the employing unit and the claimant, the decision becomes complete and of this complete decision is the claimant given notice by the deputy.

To provide for such an elaborate system of appeal for the interested parties when the claimant is granted benefits and no appeal when the claimant is denied benefits seems untenable and a strained construction which would not effectuate the purposes of the statute or give interested parties an equal right of appeal. We hold the claimant is entitled to an appeal from any decision of the deputy, whether under section 5(d) or otherwise pursuant to the statute.

2. "The 'appeal tribunal' is without the power to reverse or set aside a determination of the deputy declaring an applicant ineligible for benefits."

Section 6(c) provides in part:

"Unless such appeal is withdrawn, an appeal tribunal, after affording the parties reasonable opportunity for fair hearing, shall affirm or modify the findings of fact and decision of the deputy. * * *"

In the instant case, the deputy denied benefits to the claimant upon the grounds that the claimant's relationship with the employing unit was not within the act. The appeal tribunal overruled the findings of the deputy and found the claimant was entitled to benefits within the act. The plaintiff contends that the appeal tribunal "shall af-

firm or modify the findings of fact and the decision of the deputy" but that it cannot set aside or overrule such findings.

The rights established by the act are purely statutory and the procedure is statutory. The deputy, appeal tribunal and commission have only such authority as is expressly granted. The intention of the legislature is expressed in the act. Our purpose is to give effect to the rational intention of the legislative body creating this procedure.

The deputy first makes his finding or initial determination. Section 6(b). From this finding or decision an appeal may be taken to the appeal tribunal who shall afford "the parties reasonable opportunity for fair hearing" and shall make its decision. Section 6(c). From this decision another appeal may be taken to the commission by "any of the parties interested in a decision" and "by the deputy whose decision has been overruled or modified by an appeal tribunal." (The question of a decision by the appeal tribunal which is not unanimous has not arisen as the appeal tribunal consisted of but one individual. Section 6(e), Chapter 43, Laws Utah 1937. See Chapter 2, Sec. 6, Third Extraordinary Session Laws Colorado 1936, as amended by Chapter 260, Session Laws Colorado 1937).

There is a thread of procedure running through Sec. 6. To state that once a deputy has made a decision it is final save "to affirm or modify the findings of fact and decision of the deputy" by the appeal tribunal is a unique interpretation. If the deputy denies compensation, then the only modification which could be made would be to allow some compensation. The amount of benefits to be given an individual is fixed by statute and it is purely a ministerial act. Once the determination of whether benefits should be allowed or not is made, everything else is fixed by statute. "Any interested party" may appeal from any decision made during the proceedings and even the deputy may appeal under certain circumstances. The purpose of the act is to allow a "fair hearing" with ample opportunity for "any interested

party" to be heard and even to enable administrative officers to appeal from determinations which have been made contrary to their decisions. Sec. 6(e). The claimant had the right of appeal from the determination of the deputy and the appeal tribunal had the right to "modify," affirm or set aside the decision of the deputy in the instant case.

3. "The Commission and its agencies are without power or jurisdiction to order an alleged employer to appear and submit evidence or contest a claim made by an applicant for benefits."

In section 6(b), it is provided:

"* * * He [the deputy] shall promptly notify the claimant and any other interested party of the decision and the reasons therefore. Unless the claimant or any such interested party, * * * files an appeal from such decision and applies for a hearing, such decision shall be final and benefits shall be paid or denied in accordance therewith."

Section 6(c) provides:

"* * * an appeal tribunal, after affording the parties reasonable opportunity for fair hearing, shall affirm or modify the findings of fact and decision of the deputy. The parties shall be duly notified of such tribunal's decision * * *."

Section 6(d) provides:

"To hear and decide disputed claims, the commission shall establish one or more impartial appeal tribunals consisting in each case of either a salaried examiner, * * *or a body consisting of three members, one of whom shall be a salaried examiner, who shall serve as chairman, one of whom shall be a representative of employers and the other of whom shall be a representative of workers; * * *."

Section 6(e) provides:

"The commission may on its motion affirm, modify or set aside any decision of an appeal tribunal * * * or direct the taking of additional evidence, or may permit any of the parties to such decision to initiate further appeals before it. * * * The commission shall promptly notify the interested parties of its findings and decision."

Section 6(h) provides:

"Any decision  *  *  *  shall become final  *  *  *  and judicial review thereof shall be permitted only after any party claiming to be aggrieved thereby has exhausted his remedies  *  *  *."

Section 6(i) provides:

"*  *  *  after the decision of the commission has become final, any party aggrieved thereby may secure judicial review thereof by commencing an action in the supreme court against the commission for review of its decision in which action any other party to the proceeding before the commission shall be made a defendant.  *  *  *"

The legislature contemplated that more than the claimant might be interested in the determination of the commission, perhaps the public or the family of the claimant. There is nothing to indicate that the alleged employing unit should be made a party to the suit unless it claims to be aggrieved. It might be contended that by the very nature of things the employing unit would be opposed to having benefits conferred upon one who was formerly "performing services for wages or under any contract of hire," for them. The allowance of benefits increases or may increase the rate the employing unit may have to pay. Thereby it may be aggrieved. However, until the employing unit comes in and claims to be aggrieved and submits to the jurisdiction of the commission the determination of the commission will not be binding upon it.

Section 11 (i) provides for the subpoenaing of witnesses but not parties. Under Section 11(i) any person may be subpoenaed to submit evidence but by making an appearance as a witness, the commission does not obtain jurisdiction over the individual so as to make the decree or order binding upon the witness as a party.

It is further provided in Section 11 (g):

"*  *  *  The commission may require from any employing unit any sworn or unsworn reports with respect to *persons employed by it* which the commission deems necessary for the effective administration of this act.  *  *  *"

Upon denial by the employing unit that the claimant is "employed by it," the commission is not empowered to hold the employing unit for contempt but the courts must be resorted to and there such issue will be determined. The State Tax Commission may determine whether or not it will proceed against the employing unit to collect the tax. Section 14 (b). The district court will then determine if the claimant be employed by the employing unit within the meaning of the act.

4. "The Commission and its agencies are without power or jurisdiction to hear or determine the question of whether an alleged employer is liable for contributions to the fund. The Commission and its agencies are without power or jurisdiction to order or require an alleged employer to file wage reports."

This contention contains two parts: (a) The commission is without power to determine whether an alleged employer is liable for contributions; and (b) the commission is without power to order or require an alleged employer to file wage reports.

(a) It is contended that this exaction of contributions is a tax and should be administered and supervised by the State Tax Commission. Article XIII, Section 11 of the Constitution of the State of Utah provides, inter alia: The State Tax Commission shall administer and supervise the tax laws of the State."

The question to be determined is whether "contributions" be a tax under the general taxing power of the state, whether "contributions" be a tax under the police power to alleviate "economic insecurity due to unemployment" which is a "serious menace to the health, morals, and welfare of the people of this state" or whether "contributions" be a license or fee incident to the regulation of unemployment.

The last part of the question might be somewhat answered by the question, what is to be regulated? Is is a means of controlling business, labor, employers or employees or individuals having no relation to the payment of the "contri-

butions?" The contributions are an excise for the specific purpose of protecting the state and the people who constitute the state by alleviating suffering due to economic insecurity incident to unemployment, and a means of protecting the health, morals and welfare of the people of the state. This is a tax and as the Supreme Court of the United States said in the case of *Carmichael* v. *Southern Coal & Coke Co.*, 301 U. S. 495, 57 S. Ct. 868, 81 L. Ed. 1245, 109 A. L. R. 1327, it is not concerned whether a particular exaction is sustainable as an exercise of the police power or the taxing power of the state. This is not a regulatory measure. In the case of *Beeland Wholesale Co.* v. *Kaufman*, 234 Ala. 249, 174 So. 516, the Supreme Court of Alabama held that contributions were taxes. We so find.

Constitutional provisions must be considered as limitations on legislative power where there is language of limitation or exception. Legislative power over taxation is plenary except where limitations or exceptions are expressed in the basic law. The provisions of Sec. 11 of the state constitution specifically vest the power of administering and supervising the tax laws of the state in the State Tax Commission. Therefore, that specific provision must be considered as a limitation on the power of the legislature to place the administering and supervising power in any other officer or commission. *State* v. *Southern Pacific Company*, 95 Utah 84, 79 P. 2d 25.

Sec. 9 (c) specifically provides that "the state tax commission shall collect all contributions under this act." Section 14 (b) provides, inter alia, "If, after due notice, any employer defaults in any payment of contributions or interest thereon, the amount due shall be collected by civil action in the name of the state tax commission * * *."

The State Tax Commission is specifically charged with the responsibility of collecting the tax and when someone defaults then the tax commission is to start a civil action. The tax commission is to determine against whom they shall proceed and who is liable for the payment of contributions.

This is the function contemplated when the constitutional amendment was adopted placing upon the state tax commission the burden to "administer and supervise the tax laws."

(b) The (b) part of the contention has heretofore been determined in this opinion. The commission is not empowered to hold anyone in contempt for not filing a return when the employing unit denies the claimant is "employed by it." The commission has power to order ■ the "employing unit" to file a return but the "employing unit" is not in contempt if it does not file in accordance therewith.

The fact finding body to determine who is entitled to benefits is the Industrial Commission. With the propriety of the procedure set forth in this act, this court ■ is not concerned. The plaintiff has not been properly proceeded against and the order against plaintiff is vacated.

5. "The evidence is insufficient to support a finding that plaintiff was an employer of Hartle within the meaning of ■ the Act."

It is not contested that the commission had the power to determine whether or not the claimant was entitled to benefits.

Section 19 (j) provides, inter alia:

"(1) 'Employment' subject to the other provisions of this subsection, means service, including service in interstate commerce, performed for wages or under any contract of hire, written or oral, express or implied.

\* \* \*

"(5) Services performed by an individual for wages shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commission that—

"(a) such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

"(b) such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(c) such individual is customarily engaged in an independently established trade, occupation, profession or business."

Under the aforesetforth provisions of the leases, there are definite provisions made for the control and direction over the performance of the service both under the contract of hire and in fact. The only evidence that there is such a contractual relationship as a lessor-lessee relationship is found in the introductory provisions wherein it is stated the plaintiff does "hereby grant, demise and let unto said Lessee that portion of the company's mining property situated * * *." It is specifically provided that the lessor reserves the property and the right of property in and to all ores extracted from said "demised" premises. There is provided in the lease a general right of control and direction over the relationship created under the contract. The claimant meets the requirements for one eligible for benefits. See *Pottorff* v. *Fidelity Coal Mining Co.*, 86 Kan. 774, 122 P. 120; *Industrial Commission* v. *Bonfils*, 78 Colo. 306, 241 P. 735; *McDermott* v. *State et al.*, 196 Wash. 261, 82 P. 2d 568. A contrary result was reached, though the same principles of law were applied, because the element of control was lacking in the case of *Texas Co.* v. *Wheeless*, 185 Miss. 799, 187 So. 880.

The allowance of benefits is affirmed.

WOLFE, Justice.

I concur in the result. While the Commission may not be able to order an alleged employer to appear except as a witness by subpoena, it is the duty of the deputy to "notify the claimant and any other interested party of the decision [on the Initial Determination] and the reasons therefor." Sec. 6 (b). It would be difficult to conceive of a party, besides the claimant, who was more interested than the al-

leged employer. On the basis of said decision he may be required by the Tax Commission to "contribute" a percentage of the wage paid to that applicant and his "benefit experience" rating is affected by the finding that he was the applicant's employer. Even though notified as provided for in Sec. 6(b), the alleged employer may choose not to appear, but if he does so choose he is bound by the Commission's finding that he was an employer of the applicant. If he does appear and protest he may appeal to the Supreme Court under Sec. 6(i). He is bound to resort to the administrative procedure provided for in the Act, to have determined the question of whether he is an "employer" as defined by the Act. And such finding is res adjudicata in any proceeding against him by the Tax Commission to collect "contributions." The plaintiff correctly argues that the alleged employer is not an indispensable or necessary party to enable the Commission to determine whether the applicant is entitled to participate in the fund. The fact of whether the plaintiff was an employer of applicant as defined by the Act under Sec. 19(i) and Sec. 19(j) must be found by the Commission but it may be found upon any proper evidence without the alleged employer's being a party. But where the employer is notified of the initial determination as provided under Sec. 6(b) and that he has been found to be an "employer," it is incumbent upon him, if he desires to contest such finding, to proceed under the administrative procedure of the Act or as to such question he is bound. *State Tax Commission of Utah* v. *Katsis*, 90 Utah 406, 62 P. 2d 120, 107 A. L. R. 1477.

As to plaintiff's fourth proposition: The Commission is without power *to order* the plaintiff to pay contributions. Power to enforce collection lies with the Tax Commission. Sec. 9(c) and Sec. 14. But certainly the Industrial Commission has power to determine the fact that the alleged employer is an "employer" as defined by the Act which finding will be a thing adjudicated as far as any proceedings of the Tax Commission are concerned. The order to pay

contributions would seem to embody this finding. Moreover, such order is effective at least to start interest running (Sec. 14) and may be of value in notifying the Tax Commission to proceed to collect. The most that could be said against such an order is that it is mere surplusage. The order does not invalidate the award.

In connection with another case the question of the constitutionality of such finding by the Industrial Commission as binding at least on the employer, if not on the Tax Commission, in view of Art. 13, Sec. 11 of our Constitution, may be discussed. It suffices here to say that even if the so-called "contribution" is construed to be a tax so as to give the Tax Commission the right and duty to "administer and supervise" the tax law imposing it, such power goes only to matters dealing with the law as applied to those who fall into the tax class. There is nothing in Art. 13, Sec. 11 of the Constitution which prevents the legislature from placing in some other agency the right and duty to find the fact upon which an individual or object may fall in or out of the class subject to the tax. See Title 80, chapter 5, R. S. U. 1933. For the above reasons I cannot concur in the statement that "until the employing unit comes in and claims to be aggrieved and submits to the jurisdiction of the commission the determinations of the commission will not be binding upon it." For the same reasons I cannot agree with the statement that "the district court will then determine if the claimant be employed by the employing unit within the meaning of the act." I think that when the fact of "employment" is found for the purpose of determining benefits it is meant to be binding as to the question of determination of "contributions" at least as far as that part is involved. Otherwise, it would be like a man astride the two portions of a draw bridge. As long as the parts stayed together by perfect articulation of Tax Commission and Industrial Commission he might stand in comfort, but if there were any pulling apart he would find himself falling between administrations into the deep. A few examples will suffice also

to show the awkwardness of such holding. Y makes application for benefit payments naming X as his "employer." X is found by the Industrial Commission not to be an employer within the Act. The applicant appeals. The Supreme Court sustains the finding of the Industrial Commission. The Tax Commission nevertheless sues X for "contributions." The trial court, if we assume that it is not bound in the tax case by the decision of the Supreme Court in the appeal from the Industrial Commission, may find for the Tax Commission. The matter is appealed to the Supreme Court which is then confronted with the necessity of passing on the correctness of its former decision. Or take the opposite situation where the Industrial Commission finds that X is an "employer" within the meaning of the Act. The employer appeals. The Supreme Court reverses. But the Tax Commission, on the theory that this question is not at rest, sues for "contributions." The District Court finds for X, so the Tax Commission appeals to the Supreme Court. Various awkward situations may by the reader be conceived. The scheme of the Act seems indubitably to point to the purpose of requiring those "employers," whose "employees" are granted benefits, to contribute to the fund. One may well conceive, too, of a situation where one applicant's case would be a test for many more in like position. If the Industrial Commission may be sure that the appeal to this court from its findings as to that applicant will set the question at rest, it will be guided by the decision in said appeal in determining the question of benefits for the entire class. There is some chance, at least, to obtain in such proceedings a decision of this court before the Fund is depleted by many payments to alleged employees whose alleged "employers" need not contribute. If, however, the question is not set at rest until the Tax Commission sues and the matter is tried out in the District Court subject to appeal here, no such result may be prevented.

Where one of two constructions of the law would render an Act unworkable, or only haltingly workable, or would

fail to effectuate the obvious intent of the legislature, and another construction equally, or nearly, as feasible would bring opposite results, it is our duty to adopt the latter. I see nothing in logic or precedent that requires us to accept the construction of the main opinion. This is a case in which we are dealing with the administration of a public act designed to benefit a class and society as a whole by cushioning the effect of unemployment. It is not the case of a private controversy involving only the rights of A against B. But even in judicial actions a finding in favor of A in the matter of status or title in a suit by A against B serves in an action of A vs. C at least to establish A's right against B if that be material in the action against C. On the question of when a board acts as a public agency in the public interest, see *Amalgamated Utility Workers* v. *Consolidated Edison Co. of New York*, Feb. 26, 1940, 60 S. Ct. 561, 84 L. Ed. 493.

I am somewhat concerned about the statement:

"The question to be determined is whether 'contributions' be a tax for revenue purposes under the general taxing power of the state, whether 'contributions' be a *tax* under the police power to alleviate 'economic insecurity due to unemployment' which is a 'serious menace to the health, morals, and welfare of the people of this state' or whether 'contributions' be a license or fee incident to the regulation of employment." (Italics added.)

In my dissenting opinion in the case of *Carter* v. *State Tax Commission*, 98 Utah 96, 96 P. 2d 727, I endeavored to point out that the legislature does not consciously operate in terms of police and taxing power. It has a certain situation in regard to which it legislates. In order to accomplish its objective it may in the same Act use powers which the text book writers have denominated, taxing power, police power, and power of eminent domain. It may under its police power regulate an industry such as the liquor industry or confer benefits upon a class as in the Act under consideration. But the two are quite different. Regulation and the granting of benefits should not be confused because

the "classifiers" have chosen to include them under one comprehensive head entitled "police power." While applicants for benefits, in order to obtain such benefits, must meet certain requirements and follow certain rules and regulations, such legislation is not "regulatory" although it is an exercise of the police power. A man standing in a bread line is subject to the regulation necessary to control the line but we do not think of him as being "regulated." Certainly there is a distinction between "contributions" to a fund which is designed for the welfare of a class and a tax for general purposes, although both are "exactions," and even though the effect of both is the same on the payer. It is important, to keep our nomenclature correct but more important that our concepts not be confused. It may well be that the type of contribution which is exacted for the Unemployment Insurance Fund is not a "tax" in the sense that that term was used in the constitutional provision which gave the Tax Commission administration and supervision of tax laws. Certainly the contributions may be looked at as payments into a fund for specific purposes—the whole encompassed by the police power even though not regulatory. The error I think is dramatically illustrated in *Carter* v. *State Tax Commission,* supra. There registration of automobiles was made a part of a chapter said to be regulatory. Since registration of automobiles was a means of regulation, it was properly, if not necessarily, placed with regulation. But for coercive reasons payment of a ton mile tax for the privilege of using the highways by Diesel fuel trucks was made a condition of registration, the tax itself being a method of equalizing the cost for using the roads between vehicles using gasoline fuel and those using Diesel fuel. We held the tax on Diesel trucks unconstitutional by somehow confusing taxation with regulation, whereas the tax was only a revenue raising part of a Chapter said to be devoted to regulation. In the instant case where "contributions" are raised for the sole purpose of constituting a fund out of which unemployment compensation is payable and are part

of the warp and woof of the whole Act, they may well be conceived of as just a part of the whole plan by the State to provide unemployment insurance. I see no essential difference between a required contribution toward an unemployment insurance fund and a required payment of a percentage of a payroll into a compulsory State Insurance Fund for disability compensation as is done in Ohio. If we had the Insurance Fund plan, would such premiums be considered a tax? See *Howes Brothers Co.* v. *Massachusetts Unemployment Compensation Commission,* Mass., 5 N. E. 2d 720, 729. In the Carter case the ton mile tax went in part into a fund not to regulate but to trace car thieves and to pay the cost of transfer of titles, and other miscellaneous outlays. If the owners whose cars had been stolen or the owners of cars who wanted to transfer title had been required to pay fees into a fund to pay such costs, I do not think it would have been a revenue measure but merely a fee for services. In the Carter case the ton mile tax collected from Diesel trucks did not go into a special fund to pay for benefits to the business of driving Diesel trucks or to meet any responsibility to its employees or the public placed upon the business firms driving Diesel trucks. The tax went into a fund which was, in effect, an appropriation of the tax for general purposes. All taxes are in the end devoted to, or appropriated for, some special purpose. In the Carter case the tax went in part into a fund which was to be used to trace stolen cars, to cover the cost of transferring titles to automobiles, and to meet other miscellaneous outlays, not for the benefit of owners of Diesel driven trucks alone, but for the benefit of all automobile owners. It was a tax collected from Diesel truck owners and devoted to *one* part of the general purposes of the law. That is only what happens to all taxes.

The Unemployment Compensation Act sets up a plan which places on the employing class the duty of bearing one of the burdens which the law in its march now considers one of the hazards of industry, to wit: unemployment. Dis-

ability by accident in industry has long been considered one of the incidents which industry must be prepared to meet. Unemployment may be considered in the same light although in it the relation of cause and effect is not so clear as in cases of disability through accident which occurred during employment. Industry may be thought of as responsible for an individual's unemployment in the sense that such unemployment is caused by industry's failure to absorb him. To borrow the language in my concurring opinion in *McGrew* v. *Industrial Commission*, 96 Utah 203, 85 P. 2d 608, at page 622:

"The raise in wages by the minimum wage law makes a money contribution to the welfare of a group. It provides more by which to live, and affects therein the lives of the workers which in turn affects the public welfare. Thus indirectly the business is supposedly contributing to the betterment of conditions. This is in keeping with the expanding idea of the responsibility of business to the public; with the idea that business is not something self-contained but a part of all society; that it is the numerator in one of a series of fractions all of which have the government as representative of society for their common denominator; that the integration of business with society demands that it be not sovereign in its field but that it serve the public both by the manner of its production and by making its contribution in the form of a living wage and thus become not only a profit making and goods producing or distributing agency but a vital factor in the upbuilding of a better society."

The same idea holds in unemployment compensation. Unemployment is considered a responsibility of industry. Hence, industry is required to contribute to a fund to relieve it. The whole scheme of unemployment compensation, including the raising of a fund, may be considered as an integrated whole, all of which falls under police power since only the employee class benefits and only industry, upon whom society puts the direct responsibility, contributes to alleviate this condition of unemployment of its workers. In that sense the plan is a unit, an integrated whole, a self-contained scheme, under the police power. *Howes Brothers Co.* v. *Massachusetts Unemployment Compensation Com-*

*mission,* supra; *Tatum* v. *Wheeless,* 180 Miss. 800, 178 So. 95. If the general public, regardless of the employer-employee relationship, were taxed the situation might be different. The difference in the last analysis, may be one in degree between the relation of the unemployed and industry and the relation of the unemployed and the public. Whether the "contribution" of the employer be considered a tax earmarked for a certain purpose or just one of the elements in a self-contained system for requiring industry to care for its unemployed, may be a difference in conception only, with exactly the same practical results. But it is just these differences in degree and in conception which make differences in legal holdings and preserve the logical fabric of the law in so far as it is possible to maintain it. In *Globe Grain & Milling Co.* v. *Industrial Commission,* 98 Utah 36, 91 P. 2d 512, rehearing denied 97 P. 2d 582, this court considered the constitutionality of the Unemployment Compensation Act both under the theory that the contribution was a tax and under the theory that it was part of the police power. It must be sensed that there may be a real difference between the "tax" levied by the Federal Government on payrolls under the Social Security Act and the "contributions" to the State Fund required by our Unemployment Compensation Act although said "contributions" may be used to offset up to 90% of the Federal tax. The Federal Social Security Act (42 U. S. C. A. § 301 et seq.) does not specify that the employer may only offset a *tax* levied by the state for the purposes of providing for an unemployment insurance fund, but provides that any "contributions with respect to unemployment" made by such employer taxpayer, may be credited against the Federal tax. And it will be noted that there is not complete articulation between the "Federal tax" and the "contributions" required by our State Act. Only employers with eight or more employees are taxed by the Federal Government, whilst the State Act of 1936 (sec. 19 (f) was made applicable to employers having four or more employees, and the 1939 State

Act (chapter 52, § 19(h) makes liable for contributions those having one or more employees. It follows, therefore, that under the 1936 Act those employers in Utah having between four and eight employees are *not liable* for the Federal tax, although they are liable for contributions to the State Fund, whereas Utah employers with eight or more employees are liable for "contributions" to the State and also are liable for an excise tax to the Federal Government, which excise tax may be offset up to 90% by such employer's "contributions."

But we do not in this case need to decide whether the "contribution" is a tax or simply one of the elements in an integrated plan under the police power. If it is a tax I cannot agree that it is necessary under Art. 13, § 11 of our Constitution that the Tax Commission be given the power to decide who is or who is not in the taxable class. Under the Act the Tax Commission is given the duty to make collections. Supervision and administration of the tax laws does not necessarily include the right to determine who falls in or out of the taxable class.

In this case the Industrial Commission made an order requiring plaintiff to pay contributions to the fund. If the employer accepts the finding and pays, that ends the matter. If it does not pay, the Industrial Commission cannot enforce the order. The Tax Commission must collect. If it brings suit it may prove the relationship and the other facts found by the Industrial Commission on which liability for "contributions" depends, provided the employer was properly notified and provided such facts were competently introduced. I opine that the Tax Commission might prove such facts whether or not the findings of the Industrial Commission were followed by an order that the employer contribute. Such an order, even if it be considered mere surplusage, does not invalidate the findings and award of benefits by the Industrial Commission, and the Tax Commission may proceed to enforce the liability whether or not Industrial Commission has made an order to contribute. In

fact, there is nothing to prevent the Tax Commission from proceeding to collect from those employers which it decides should contribute, regardless of any application for unemployment compensation. Certainly the liability to "contribute" does not depend on whether someone applies for unemployment compensation.

LARSON, Justice.

I concur in the result and in what is said in Points 1, 2, and 5 as discussed by Mr. Chief Justice MOFFAT in the main opinion. I also concur in the statement of Mr. Justice McDONOUGH that "under the statute the duty of collecting contributions is vested in the Tax Commission, [and] the action of the Industrial Commission ordering payment of the contributions should be set aside upon the authority of the statute * * * the conclusiveness—in a proceeding by the Tax Commission to collect contributions—of a finding of the Industrial Commission as to the relationship existing between an applicant and an alleged employer is not here involved."

McDONOUGH, Justice.

I concur in the result. It being clear that under the statute the duty of collecting contributions is vested in the Tax Commission, the action of the Industrial Commission ordering payment of the contributions should be set aside upon the authority of the statute. Hence, the constitutional question discussed is not, in my opinion, before us. Likewise, the order being vacated on such ground, the conclusiveness—in a proceeding by the Tax Commission to collect contributions—of a finding of the Industrial Commission as to the relationship existing between an applicant and an alleged employer is not here involved. I, therefore, withhold my concurrence from that part of the opinion which discusses these questions.

PRATT, Justice (concurring in part, dissenting in part).

The prevailing opinion has discussed this case under five headings. I concur in numbers one, two, and five. I dissent as to numbers three, four, and the result, for the reasons I have set out in my opinion in the Logan Cache Knitting Mills case, *Logan-Cache Knitting Mills* v. *Industrial Commission*, 99 Utah 1, 102 P. 495. Under heading No. 3, the prevailing opinion includes this: "* * * without power or jurisdiction to ORDER an alleged employer * * *." (Capitals mine). Naturally the Commission cannot insist that the alleged employer appear and actively contest or agree that he is such an employer as defined by the act; but if the alleged employer is properly "ordered," "summoned," or "notified"—call the process by such name as you wish—and defaults, he will be bound by the decision of the Commission on that point as in any default, and bound as I have indicated in the Knitting Mills case to which reference is made above.