## POWELL v. INDUSTRIAL COMMISSION.

No. 7250.  Decided November 8, 1949.  (210 P. 2d 1006.)

386

See 51 C. J. S., Landlord and Tenant, sec. 26.

*Thorit Hatch,* Helper, for plaintiff.

*Grover A. Giles,* Attorney General, *Fred F. Dremann,* Salt Lake City, for defendant.

WOLFE, Justice.

This is an original proceeding to review a decision of the Industrial Commission holding that the plaintiff, B. Grant Powell, during the period from July 1944, to September 30, 1947, operated a coal mine; that in the course of said operation he paid wages for services performed in employment; and that he was subject to the payment of percentage contributions to the unemployment compensation fund on said wages. Powell resists payment of the contributions primarily on the ground that during the aforementioned period he did not operate a coal mine nor pay wages for services performed in connection therewith, but that he leased the mine to a succession of persons during that period and from them he purchased the coal which they mined.

The undisputed evidence is as follows:

In 1941 Powell began development work on certain coal properties in Carbon County, Utah, preparatory to the production of coal. Title to the lands was held by his wife. He did most of this work himself which included the building of a road, clearing overburden, and installing track and equipment. He testified that in 1944 he commenced operation of the mine under the name of Royal Blaze Coal Company and in July of that year he entered into an oral agreement with one Jim Cruthis whereby the latter was to receive from Powell one dollar and fifty cents for every ton of coal mined by Cruthis and delivered to the bins at the mine. Out of this one dollar and fifty cents per ton, Cruthis was to pay for the powder and caps which he used. Powell agreed to furnish housing for Cruthis, rock dust, timber, rails, fuel oil, horses, feed for the horses, necessary equipment in the mine, and to keep the equipment in repair. Most of the coal mined was sold to truckers at the mine, Cruthis usually handling the sales for Powell. Cruthis would turn all the money resulting from the sales over to Powell, except at times when he would withhold for himself one dollar and fifty cents for each ton sold to the truckers. Cruthis hired and paid men to help him in the mine; Powell took no part in their selection nor in determining what they were to be paid. Powell inspected the mine at irregular intervals to see that it was kept in a condition which would pass state inspection.

After working for about nine months, Cruthis left the mine, and from that time until September of 1946, except for temporary shut-downs, there was a succession of men who worked in the mine under oral agreements with Powell substantially the same in terms as the agreement with Cruthis. Then in September of 1946, Powell entered into a written agreement with Richard and Ralph O'Neil who were partners with their father and another brother. In this agreement which was similar in many respects to the oral agreements, the O'Neils agreed to keep the mine in

continuous production and to operate the same in accordance with good mining practices in order that the mine would pass federal and state inspection. Payment for the coal they produced was to be made weekly and in the event the O'Neils did not perform the terms of the agreement, Powell was given the right to retake possession of the mine. Powell carried a policy of workmen's compensation insurance on the O'Neil brothers in his own name, but the O'Neils paid him the amount of the premiums.

As production increased at the mine, not all the coal was purchased by truckers at the bins, and Powell entered into oral agreements with certain truck owners who agreed to haul the coal from the mine to the railroad for shipment to Powell's customers. Powell himself also trucked coal from the mine to the railroad. Occasionally the O'Neils assisted in loading coal from the bins into the trucks and constructed stoppings in the mine. For these services they were paid in addition to the one dollar and fifty cents which they received for delivering the coal to the bins.

The agreement with the O'Neils was terminated in the spring of 1947 and on June 25th of that year, Powell entered into a written agreement with one DeLoy Safley and Elmer Babcock whereby the latters agreed to mine coal on substantially the same terms as were contained in the O'Neil agreement. But in addition thereto, the agreement provided that Safley and Babcock would not leave excessive bottom coal in the mine; that entries should not be wider than eighteen feet and rooms not wider than twenty-five feet; that Powell would furnish the materials to make necessary stoppings in the mine and that Safley and Babcock would construct the stoppings for thirty dollars each; that they would be paid on the 10th and the 25th of each month for the coal which they produced; and that they would produce a minimum of 200 tons per day and operate the mine six days a week. Powell testified that after Safley and Babcock commenced mining coal the state inspected the mine and threatened to shut it down unless there was a certified fore-

man in the mine, and that consequently Safley and Babcock took one Eldon Harwood, who was a certified mine foreman, into partnership with them.

The plaintiff's first contention is that there is only one remedy for the collection of contributions to the unemployment compensation fund from an employer and that remedy is a civil suit by the State Tax Commission against the employer. Therefore the plaintiff claims that the Industrial Commission acted without jurisdiction in determining that he owed contributions to the fund. The plaintiff relies upon the language of this court in *National Tunnel & Mines Corporation* v. *Industrial Commission*, 99 Utah 39, 102 P. 2d 508, 514, wherein it was said:

"The State Tax Commission is specifically charged with the responsibility of collecting the tax and when someone defaults then the tax commission is to start a civil action." See also a statement to the same effect in *Fuller Brush Company* v. *Industrial Commission*, 99 Utah 97, 104 P. 2d 201, 129 A. L. R. 511.

In 1940 when the two aforementioned cases were decided, the Tax Commission was charged by statute with the duty of collecting contributions to the unemployment compensation fund. L'37, Chap. 43, Sec. 2, amending L'36, Sp. Sess., Chap. 1, Sec. 9, provided that:

"The state tax commission shall collect all contributions under this act."

Also in force in 1940 was Chap. 1, Sec. 14(b), L'36, Sp. Sess., providing that:

"If, after due notice, any employer defaults in payment of contributions or interest thereon, the amount due shall be collected by civil action in the name of the state tax commission   *   *   *"

But in 1941 the legislature removed the responsibility of collecting contributions from the Tax Commission and gave it to the Industrial Commission by enacting Sec. 42-2a-14, Utah Code Annotated, 1943, which provides in part:

"(b) If an employer fails to file a report when prescribed by the commission ['commission' meaning Industrial Commission when used in this and the following subsection] for the purpose of determining the amount of his contribution due under this act, or if such report when filed is incorrect or insufficient, or is not satisfactory to the commission, the commission or its authorized representative may determine the amount of wages paid for employment during the period or periods with respect to which the reports were or should have been made and the amount of contribution due from such employer on the basis of such information as it may be able to obtain, and it shall give written notice of such determination to the employer. Such determination shall be deemed correct unless the employer shall, within ten days after mailing or personal delivery of notice of such determination, apply to the commission for a review of such determination as provided in section 10 of this act, or unless the commission or its authorized representative of its own motion shall review the same. The amount of contribution so determined shall be subject to penalties and interest as provided in section 14(a) of this act.

"(c) If, after due notice, any employer defaults in any payment of contributions, interest or penalties thereon, the amount due shall be collectible by civil action in the name of the commission, and the employer adjudged in default shall pay the costs of such action. Civil actions brought under this section to collect contributions, interest or penalties thereon from an employer shall be heard by the court at the earliest possible date and shall be entitled to preference upon the calendar of the court over all other civil actions except petitions for judicial review under this act and cases arising under the workmen's compensation law of this state."

The Industrial Commission since the inception of the present dispute with Powell has acted pursuant to express statutory authority. The Commission through its Department of Employment Security, as provided in Section 14(b), supra, determined that Powell had paid "wages for employment" and accordingly notified the plaintiff thereof, and made demand for payment of contributions thereon. The plaintiff appealed to the Appeals Tribunal as provided for in Sec. 42-2a-10(b), U. C. A. 1943, which after modifying the amounts due affirmed the decision of the Commission representative. The plaintiff next appealed to the Industrial Commission, pursuant to Sec. 42-2a-10(d). The Industrial Commission affirmed the decision of the Appeals

Tribunal and Powell commenced an action in this court to review the Commission's decision.

The plaintiff secondly contends that the findings and conclusions of the Appeals Tribunal which were affirmed by the Industrial Commission are contrary to the evidence and the law. Powell argues that the men who worked his mine were not in his employment, but that by virtue of the agreements entered into between the parties, the relationship of lessor-lessee existed between the miners and himself. In determining the merit of the plaintiff's contention, the following definitions from the Employment Security Act should be kept in mind. Sec. 42-2a-19, defines "employment" as follows:

"(j) (1) 'Employment' means any service performed prior to January 1, 1941, which was employment as defined in the Utah Unemployment Compensation Law prior to the effective date of this act, and subject to the other provisions of this subsection, service performed after December 31, 1940, including service in interstate commerce, and service as an officer of a corporation performed for wages or under any contract of hire written or oral, express or implied."

Wages are defined in the same section of the statute as:

"(p) 'Wages' means all remuneration for personal services, including commissions and bonuses and the cash value of all remuneration in any medium other than cash. Gratuities customarily received by an individual in the course of his employment from persons other than his employing unit shall be treated as wages received from his employing unit. The reasonable cash value of remuneration in any medium other than cash and the reasonable amount of gratuities shall be estimated and determined in accordance with rules prescribed by the Commission; * * *"

Turning now to the question of whether the plaintiff had persons in his employment as defined by the Act, it must first be determined whether there was a "service relationship" between Powell and the several persons who entered into the oral and written agreements with him to work the mine. If there existed a "service relationship" the plaintiff was an employer and came within the operation of the act

although he may be excluded by the subsequent test contained in subsection (j) (5) (A), (B) and (C), quoted below. *Fuller Brush Co.* v. *Industrial Commission,* supra.

When a service is performed for a person by another for a remuneration whether that remuneration is a commission, a bonus, or whether it is received in cash or other medium a "service relationship" arises. Thus true vendor-vendee and lessor-lessee relationships are not service relationships. The agreements entered into between Powell and the several parties were called "leases" by them. Powell denominated himself the "lessor" and called the other parties the "lessees." But as we said in *Singer Sewing Machine Co.* v. *Industrial Comm.,* 104 Utah 175, 134 P. 2d 479, 485,

"In determining if the relationship is within the act, the Commission and the court will look behind the contract to the actual situation.—the status in which the parties are placed by the relationship that exists between them."

Looking behind the nomenclature employed by the parties in their agreements and looking at the operation of the mine as testified to by Powell and by Ralph and Richard O'Neil, there is substantial evidence to support the Commission's conclusion that there was a service relationship between Powell and his "lessees," and that a bona fide lessor-lessee relationship did not in fact exist. At bottom, the so-called leases were nothing more than contracts of hire wherein the employees' remuneration was dependent upon the work accomplished by them instead of upon the time spent in labor.

The plaintiff's argument that he paid his "lessees" the one dollar and fifty cents not as remuneration for services performed, but as a price for coal which he purchased from them under the terms of the lease, is unsound. The very written agreements which Powell entered into with the O'Neils and with Safley and Babcock did not express that Powell would purchase the coal which they

produced, but simply provided that Powell would pay them one dollar and fifty cents for every ton of coal delivered to the bins. Furthermore, there is no evidence that any of the so-called lessees had any legal ownership in the coal they mined before it was "sold" to Powell. In a true lessor-lessee relationship the lessee has a part ownership, at least, in the fruits produced on or taken from the leased property. In reality, the coal which was mined here was at no time the property of the "lessees." They were but performing a service for Powell, viz. digging his coal and placing it in his bins, and at times acting as Powell's agent in selling the coal to the truckers who came to the mine. As an additional service the O'Neils occasionally loaded coal from the bins into the trucks and certain of the "lessees" constructed necessary stoppings. The services which the miners performed were but a part of an operation carried on by Powell. The other parts of the operation were performed by Powell himself and the truckers employed by him to haul coal from the bins to the railroad.

Another matter which leads us to the belief that the miners did not sell the coal they produced to Powell is the fact that regardless of the fluctuations in the price of coal, the miners received the same price for the coal they produced—one dollar and fifty cents per ton. While we recognize that parties may contract to buy and sell the total output of a mine at a unit price, still the arrangement between the parties in the instant case smacks more of a contract of employment than of a contract to buy and sell because here the "buyer" had possession of the mine.

Having then found that there is substantial evidence that a "service relationship" existed between Powell and his "lessees," and following the procedure which is perhaps more accurately set out in the dissenting opinion in *Fuller Brush Co.* v. *Industrial Comm.*, supra, it must next be determined whether the service relationship is excluded from the operation of the Act by the test

posed in Section 42-2a-19(j) (5) (A), (B) and (C), providing that:

"(j) (5) Services performed by an individual for wages or under any contract of hire, written or oral, express or implied, shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the Commission that—

"(A) such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of hire and in fact; and

"(B) such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(C) such individual is customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the contract of service."

Here again we must resolve this test in favor of the Commission. There is substantial evidence to support the commission's conclusion that all three requirements of the exclusion test were not met and hence the service relationship remained within the operation of the Act. As to the requirement embraced in (A), that the individual performing the service be free from control or direction over the performance of the services he renders, there is little doubt but what Powell, while not directing every detail in the process of mining the coal, did in a general way direct and have control of the complete mining operation. Richard O'Neil testified that Powell "didn't do the actual work, but he did do a lot of directing." The agreement with the O'Neils provided that the latters would keep the mine "in continuous production" and the Safley and Babcock agreement required the "lessees" to operate the mine six days a week and produce a minimum of 200 tons per day. These provisions in effect specified the number of hours per day and days per week the "lessees" must work, and gave Powell considerable control over their services. The fact that Powell did not participate in the selection of the men who were hired by the "lessees" to help them nor in determining what

they were to be paid, does not preclude the hired help from being in fact employees of Powell in view of Sec. 42-2a-19 (h) (2) which provides:

"(2) Each individual employed to perform or to assist in performing the work of any person in the service of an employing unit shall be deemed to be engaged by such employing unit for all the purposes of this act whether such individual was hired or paid directly by such employing unit or by such person, provided the employing unit had actual or constructive knowledge of the work."

It is likewise clear that the requirement contained in subsection (j) (5) (C) cannot be met. There is no evidence whatever that the "lessees" were

"customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the contract of service."

As was pointed out in *Fuller Brush Co.* v. *Industrial Comm.*, supra, a shoe shiner, an auto mechanic, a plumber, and a barber meet this requirement because the services which they perform emanate as a part of a business in which they are engaged. They perform services for others while in the pursuit of a general business independently established and in which they are customarily engaged. See Determination of Employer-Employee Relationships in Social Legislation, Vol. XLI, Columbia Law Review, p. 1015. By no stretch of the imagination can it be said that the service performed by the so-called lessees for Powell were performed as a part of a business in which they were independently established. In reality, the service which they performed for Powell was their only business, if service for another as an employee can be called a business.

The order of the Industrial Commission is affirmed. Each party to bear its own costs.

PRATT, C. J., and WADE, LATIMER and Mc-DONOUGH, JJ., concur.