## SALT LAKE TRIBUNE PUB. CO. v. INDUSTRIAL COMMISSION et al.

No. 6114.   Decided May 4, 1940.   (102 P. 2d 307.)

*Ingebretsen, Ray, Rawlins & Christensen,* of Salt Lake City, for plaintiff.

*Joseph Chez,* Atty. Gen., *S. D. Huffaker,* Asst. Atty. Gen., and *A. N. Ferro* and *F. F. Dremann,* both of Salt Lake City, for defendants.

McDONOUGH, Justice.

This case arises under our Unemployment Compensation Law, Chapter 1, Laws of Utah 1936, Special Session, as amended by Chapter 43, Laws of Utah 1937. The Industrial

Commission determined, through its appeal examiner, that applicant Lynn Clark Cushing was entitled to receive unemployment benefits, having performed services for wages for plaintiff and being under the direction and control of said company in the performance of such services. The plaintiff company instituted this action to review the decision of the Commission, urging that there is no evidence to support its findings and decision.

This court has recently had occasion to consider our Unemployment Compensation Act. *Globe Grain & Milling Co.* v. *Industrial Commission,* 98 Utah 36, 91 P. 2d 512, rehearing denied, 98 Utah 48, 97 P. 2d 582; *Creameries of America* v. *Industrial Commission,* 98 Utah 571, 102 P. 2d 300. Therein we made an analysis of the Act and construed the provisions thereof pertinent to certain questions of law here presented. It will, therefore, be unnecessary in this case to discuss the points resolved in the prior decisions.

The first question to be determined in this case is whether, under the facts, the applicant Cushing was performing personal services for wages for the plaintiff herein.

Lynn Clark Cushing entered into a contract with plaintiff publishing company whereby the former was to be a "circulator" or "carrier" of plaintiff's publications within a certain district. The company was to furnish all newspapers, required by the circulator, at certain fixed prices, the papers to "be and become the property of said circulator." In turn the circulator was to sell and distribute "as he may see fit" to purchasers or subscribers, the business to be "solely under the control and direction of said Circulator." He was, however, required to sell the newspapers at a certain fixed price. The contract further provided as follows:

"It is agreed and understood that the Publisher has no right of control, supervision or direction over said Circulator, or the means or method by which he may sell or distribute said newspapers and/or publications or cause the same to be sold or distributed, but the Circulator does recognize that the Publisher has an ultimate interest

in the sale and distribution of its newspapers and publications and the regular and prompt delivery thereof in a manner acceptable to the purchasers thereof and subscribers therefor, which inures to the Publisher's benefit, and the Circulator agrees to deliver said newspapers and publications regularly and promptly and in an acceptable manner to those purchasing them or subscribing therefor by agreement made by or in behalf of said Circulator as aforesaid."

Settlement with the company for all newspapers and publications delivered to the circulator was to be made every month. The contract was to run from month to month unless terminated by either party "with or without cause, upon 15 days' notice in writing." Upon termination of the contract the circulator was required to turn over to the company "all paid-in-advance subscriptions, together with the names and addresses of all subscribers and the expiration of their subscriptions, with a full statement of the Circulator's claims against the Publisher, that a prompt settlement may be had as between the Publisher and Circulator."

Under the terms of such a contract it is clear that Cushing was to perform "personal services" for the publishing company. *Creameries of America* v. *Industrial Commission,* supra. The company was interested in seeing that its newspapers reached its subscribers and in order to accomplish that result it entered into a contract, whereby a carrier or circulator was to perform the service of delivering newspapers and other publications "to those purchasing them or subscribing therefor by agreement made by or in behalf of said Circulator."

And the amount to be received for such services constitutes "wages" as that term is defined by the Unemployment Compensation Act. The circulator was required to pay the company a certain price for the publications received and was required to charge the subscriber a certain price for them. The difference between the two figures was the remuneration "payable for personal services" which the Unemployment Compensation Act defines as wages.

It is contended by the plaintiff, however, that even though it be determined that Cushing was performing services for wages for petitioner, still the conditions set out under subsections (a), (b), and (c) of Section 19 (j) (5) of the Act were concurrently present to preclude his right to receive unemployment benefits.

Subsection (a) provides in effect that the individual who performs "services for wages" is within the protection of the Act unless it is shown to the satisfaction of the Commission that he is free from control or direction over the performance of the services, *both under the contract of service and in fact.* The Commission, through its appeal tribunal, found that Cushing was not free from the control or direction of the publishing company, which finding the company urges is not supported by the evidence.

An examination of the record reveals that the finding of the Commission is supported by substantial evidence. A review of it follows:

Frank Baldwin, circulation manager for the publishing company, testified that the company employed district managers to instruct the carriers with respect to delivering the newspapers to the customers, making collections, and obtaining new subscribers. The district manager "goes over their routes, spots and finds out where a boy might fail to pick up his papers or deliver them—*various responsibility of supervision, the same as I might do.*" (Italics added.) "He is responsible for the boys, to give them assistance that they might require." Where complaints came into the company from subscribers they were referred to the district manager who took them up with the carrier.

Mr. Baldwin further testified that the carriers were required to keep a list of subscribers and an account for each one. Order blanks were furnished to the carriers by the company for the purpose of ordering additional papers from the company for new customers or decreasing the order where some customer was discontinued. Where a new

subscription was sent in by the carrier, the company mailed the subscriber a subscription card.

On re-examination by counsel for plaintiff Mr. Baldwin testified, in response to the following question:

"Mr. Christensen: You said in response to the question that the district supervisors act in a supervisory capacity over the boys. Do they supervise the boys as to the method of doing the business or just as to the result? A. Result entirely."

In explanation of this he testified:

"* * * for instance, if a boy is late getting started, we say 'here, these people around here want their paper to read in the morning. You should get out there and make this delivery early or you are going to lose business, going to lose subscribers that are supposed to get their paper.' And another thing, if the boy's route is going down we say 'Now, Bill, do you think you are handling this to your own interest there? Are you putting forth a reasonable effort to give good service, to secure new readers, new customers;' *a general supervision. We see that the boy functions as a carrier there as he should function.*" (Italics added).

He also stated that subscribers could pay their bills to the company at its offices, or mail the money to the office. The company accepted such payment and in turn would credit the amount on the carrier's account with the company.

Walter Clark, who was manager of the district in which Cushing was a carrier, during the entire time Cushing's contract with the company was in force, testified that he, Clark, was supposed to help the carriers "every way possible, securing subscriptions, making collections." He was supposed to be their supervisor. Further than that the company did not instruct him what to do, except at different times he was asked why he "didn't do this or that." He instructed the boys with respect to delivering their papers and generally kept a check on them to see that they did their work. Occasionally meetings were called, and he instructed the boys to attend. If someone failed to come to the meetings he "would get after him, maybe tell him that

that was part of his work." It became necessary now and again to terminate a boy's contract "because of either failure to pay their bills or poor service."

Applicant Cushing testified in his own behalf that when he took over the newspaper route the boy who had had it previously was behind in his accounts so that it was necessary to contact the subscribers to straighten things out. He was supposed to get his papers and have them delivered by 6:30 a. m., each morning. The district manager was frequently there to see that each boy received his papers and delivered them on time. The district manager approached him occasionally with respect to some complaint made by a subscriber, which complaint had been received through the home office. At one time he was informed, either by letter from the company or by the district manager personally, that unless he obtained new subscribers he would have to give up his route. At times the company would send out someone to canvass his route to obtain new subscribers. He always contacted people who were suggested to him as prospective subscribers.

In addition to the above testimony, the exhibits submitted by plaintiff at the request of the examiner support the finding that the company exercised control and direction over the performance of services rendered by Cushing. A circular sent out by the company to all carriers contained a number of questions with respect to what a carrier should do and what his responsibilities were. Among other things it stated that in order for a carrier to obtain additional papers from the company he should send in to the office a subscription contract or  start, containing the name and address of the new subscriber. The company would then send the carrier an additional paper and a route card for his account book. It would also send the customer a house card.

In answer to the question "Are carriers supposed to solicit?", the circular stated: "Yes, Carriers must spend a

certain amount of time soliciting and endeavoring to get new subscribers."

The company also sent out letters to delinquent subscribers to secure payment of past due accounts. Such a letter read, in part:

"In checking over the route book of the carrier who delivers the Salt Lake Tribune in the district in which you live, we notice that your subscription account is in arrears from————. This amounts to $———— to date and represents the carrier's profit on a number of other subscribers." Or "In checking the accounts of our representative we find a past due balance of $———— on your subscription."
Further

"We trust that you enjoyed having the paper delivered to you, and feel sure that you will be willing to make prompt settlement of the balance due. We have asked our dealer to call on you again within the next day or two and shall look forward to receiving his report that payment has been made."

A "draw change order" blank sent out to the carriers stated that no increase or decrease in the number of papers sent to the carrier would be made unless certain detailed information concerning the new subscriber or reasons for dropping a subscriber were sent in by the carrier.

The carrier was required to keep a route card for each customer, which card had to be returned to the company when the carrier wished to discontinue serving that customer. On the card was the following instruction:

"No cuts made unless this route leaf is returned to the office *giving detailed reasons for the stop.*" (Italics added).

The contract itself provided that the company could terminate the relationship between it and the carrier at any time "with or without cause" by giving fifteen days' notice. The evidence further shows that the subscribers were the customers of the company rather than of the individual carriers. A carrier received nothing from his route other than what was received by the distribution of newspapers to subscribers during the life of his contract with the com-

pany. At the termination thereof all paid in advance subscriptions had to be turned over to the company, together with a list of all subscribers who continued to receive the newspaper from some other carrier. In its effort to maintain these subscribers and obtain new ones, the company was continually offering inducements to the carriers, "supervising" their work, and requiring them to do particular acts designed to effectuate the ends of the company.

While there is also some evidence in the record to the effect that the company had no right to, and did not in fact, exercise any "control or direction over the performance" of the services performed by Cushing, still the evidence set out above is ample to support the finding of the Commission that "the claimant in this case was not free from direction and control over the performance of service rendered under his contract?" At all events the evidence is such that we cannot say that the Commission must, as reasonable men, have found that claimant was free from such control.

Having already determined that Cushing performed "personal services for wages" for plaintiff, it follows that, inasmuch as the finding of the Commission that applicant was not free from control and direction over the performance of his services is supported by the evidence, the decision of the Industrial Commission granting unemployment benefits to the applicant Cushing should be affirmed.

WOLFE, J. concurs.

MOFFAT, Chief Justice (concurring).

I concur in the conclusion that Cushing was rendering service for wages as defined by the statute.

LARSON, Justice (concurring).

I concur in the result.

PRATT, Justice (concurring).

I concur in the reasoning and conclusion to the effect that the contractual relationship here is one of employment

as defined, and that the Commission's finding that applicant is not excluded by Sec. 19 (j) (5) is supported by the evidence.