SINGER SEWING MACH. CO. v. INDUSTRIAL COMMISSION OF UTAH, DEPARTMENT OF PLACEMENT AND UNEMPLOYMENT INSURANCE et al.

No. 6354.   Decided February 19, 1943.   (134 P. 2d 479.)

See 39 C. J. Master and Servant, sec. 362; R. C. L. 8, Perm. Supp., Supplement 2314.

*Fabian, Clendenin, Moffat & Mabey,* of Salt Lake City, for plaintiff.

*A. M. Ferro* and *F. F. Dremann,* both of Salt Lake City, for defendants.

LARSON, Justice.

This is an original proceeding to review a decision of the Commission holding that defendant, Winget, a salesman operating on a strictly commission basis under a particular type of contract, No. 72, was in the employment of the plaintiff company, within the contemplation of the Utah Unemployment Compensation Law. Laws 1936, Sp. Sess.,

c. 1, as amended by Laws 1937, c. 43. There is no factual dispute in this case, and we have before us only a question of law. Briefly, defendant, Winget, entered into a written contract with plaintiff to perform a series of acts, sales and collections in connection with the selling of plaintiff's merchandise, at specified rates of commission. Hereinafter, the plaintiff will be referred to as the Company, the defendants as the Commission, and the salesman, respectively. In form, the contract was an agency agreement. It authorized the salesman to hold himself out to the public as duly authorized to effect the sale of the Company's sewing machines and vacuum cleaners and to make collections on accounts entrusted to him. The salesman is not obligated either to make sales or to accept accounts for collection, but his contract was terminable at the will of either party. The Company fixes the net cash price of its new merchandise which must be paid to the Company; sales may be made on title retaining contract basis on forms approved and furnished by the Company, the title being retained by the Company, the sales contract being forwarded to it. The salesman was required to keep the Company advised of addresses of purchasers, and to do anything the Company deemed advisable for the protection of its interest and rights under any credit sale made by him, or account entrusted to him. If the salesman made collections on these contracts he received a commission on such collections, in addition to his sales commission. If he did not choose to make the installment collections, such were handled from the Company office. New machines sent out to the salesman were consigned and he was required to report weekly the goods he had on hand. The salesman could take in old machines or other matters on the purchase price of new machines at figures to be fixed by himself, but in all cases he had to account to the Company by cash or title contract representing cash for the net cash sale price fixed by it. The "trade-in" machines were applied on the commissions of the salesman, and became his property. The salesman

himself determined the amount of time he devoted to the business of the Company and where he maintained his place of business. He could handle other lines of merchandise for other firms, and could sell his "trade-in" machines in competition with the Company's new line. Be it understood, these facts apply only to salesmen operating under contract No. 72. Many of the Company's salesmen operated under a different contract not here involved.

There is presented a single law question: Is the salesman operating under such contract (Contract 72) operating "in employment" within the meaning of the Utah Unemployment Compensation Law? The solution of this question should present no difficulty since in all seven cases which have come before this court involving this law, we have defined what constitutes employment under the law, and the tests for determining the question. Each member of the court has expressed his views, and there is no conflict except one of words between them. But since much of the argument in this case centers around the meaning or interpretation of those opinions, we deem it advisable to examine them all, and clarify any doubts as to what the court has held: First, as to the basis of approach and interpretation of the Act; Second, as to tests of employment under the Act. We explore these propositions in order by an examination of the cases. In *Globe, Grain & Milling Co.* v. *Industrial Comm.*, 98 Utah 36, 91 P. 2d 512, the first case to come before us, it was admitted applicant was in the employ of the Company and received wages as that term is defined in the Act. The principal question was as to whether he was then to be denied compensation as one sifted out by Sec. 19 J(5) of the Act. We there stated without any elaboration, that the term "employee" under the Act was broader than that term under the common law; that the relationship covered by the Act was one broader and beyond that of the mere master and servant relationship. Our next case was *Creameries of America* v. *Industrial Comm.*, 98 Utah 571, 102 P. 2d 300, 302. We there referred

to the Globe case as one in which we held the Act did not restrict the benefits to those coming strictly within the common-law concepts of servants and employees, and then stated that the Creameries case presented just two questions: (1) Did applicant perform "services for wages" within Sec. 19 J(1) of the Act? (2) If so, was he excluded from benefits by Sec. 19 J(5)?

All the court agreed that applicant was an employee within the Act because he performed "services for wages" as defined by the Act. We also agreed that having been brought within the Act 19 J(1) he was entitled to benefits, because he was not sifted out through the exception set forth in Sec. 19 J(5). In the course of the opinion we said:

"it seems clear to us that the legislature has endeavored to define by the Act itself a classification of individuals entitled to unemployment benefits."

And again:

"We adhere to our previous decision * * * that whether * * * Foss is entitled to unemployment benefits must be determined from the tests laid down in the [Act], rather than from any common law concepts of master and servant,"

and then indicate that the terms "services" and "wages" are both broader than their common-law counterparts. The case of *Salt Lake Tribune Pub. Co.* v. *Industrial Comm.*, 99 Utah 259, 102 P. 2d 307, was confined to a determination as to whether there was evidence to support the Commission's findings. All members of the court held the evidence sufficient. *Logan Cache Knitting Mills* v. *Industrial Comm.*, 99 Utah 1, 102 P. 2d 495, decided merely the question of the sufficiency of the Commission's findings to sustain an award. In *National Tunnel & Mines* v. *Industrial Comm.*, 99 Utah 39, 102 P. 2d 508, as far as the opinion of the court is concerned, propositions not pertinent to any matters here involved only were dealt with. *Combined Metals Reduc. Co.* v. *Industrial Comm.*, 101 Utah 230, 116

P. 2d 929, was a memorandum decision based on the National Tunnel case and contained no discussion of the question here posed.

The only remaining case from this jurisdiction is *Fuller Brush Co.* v. *Industrial Comm.*, 99 Utah 97, 104 P. 2d 201, 129 A. L. R. 511. The first question now under consideration was not involved or discussed in the court's opinion in the Fuller Brush case but the second question was.

That opinion, however, was carefully confined to the interpretation of a specific section of the statute, Sec. 19 J(5), and to consideration of the facts involved as shown by the record in that case. We shall refer to that opinion more fully later. At this point, it suffices to say that the opinion in the Fuller case cited with approval every preceding opinion of this court involving interpretations of the Unemployment Compensation Laws, as the basis and foundation from and upon which we proceeded in the Fuller case. As far as the first question immediately under consideration is concerned, the opinions of the court heretofore rendered have not directly spoken. But the members of the court in individual opinions in the cases have expressed themselves. Chief Justice Moffat, in the National Tunnel case, supra [99 Utah 39, 102 P. 2d 512], said:

"The rights established by the act are purely statutory and the procedure is statutory."

Also,

"The contributions are an excise for the specific purpose of protecting the state and the people who constitute the state by alleviating suffering due to economic insecurity incident to unemployment, and a means of protecting the health, morals and welfare of the people of the state."

Said Mr. Justice Wolfe, on petition for rehearing in the Globe case, 98 Utah 48, 97 P. 2d 582, supra:

"Since the act applies to a new field of law which has its own glossary and defines the relationships to which it applies, the introduc-

tion of old concepts which fitted into the conceptual pattern of tort liability carried over into this field may only be confusing."

And in his dissenting and concurring opinion in the National Tunnel case, supra, he says:

"We are dealing with the administration of a public act designed to benefit a class and society as a whole by cushioning the effect of unemployment. * * * The whole scheme of unemployment compensation, including the raising of a fund, may be considered as an integrated whole, all of which falls under police power since only the employee class benefits * * *. In that sense the plan is a unit, an integrated whole, a self-contained scheme, under the police power."

Mr. Justice McDonough, speaking for the court, said in *Creameries of America* v. *Industrial Comm.*, 98 Utah 571, 102 P. 2d 300, 302:

"* * * it seems clear to us that the legislature has endeavored to define by the Act itself a classification of individuals entitled to unemployment benefits. Hence, the statutory definition, rather than any common law concepts, if differing therefrom, govern—insofar as they are applicable. * * *

"That 'Section 19 (j) (5) signifies a relationship entitled to benefits of the act beyond that of a mere master and servant relationship' as stated in our opinion in *Globe Grain & Milling Co.* v. *Industrial Commission*, supra, * * * is borne out by the fact that at the 1939 session of the state legislature amendments were offered in the Senate to so modify the definitions of Section 19 as to confine the benefits of the Act to a strict master and servant relationship. Such amendments were rejected."

In *Fuller Brush Co.* v. *Industrial Comm.*, 99 Utah 97, 99, 104, P. 2d 201, 202, 129 A. L. R. 511, the court, through Mr. Justice Larson, said the act covers

"individuals who have been, or are in *employment* and who receive therefor *wages as those two terms are defined in the act*" (italics added),

and cited every Utah case referred to above in this opinion. In the same opinion, 99 Utah at page 100, 104 P. 2d at page 202, he says:

"Did he render personal services? If so, did he, or was he entitled to receive therefor remuneration based upon such personal service? If both these questions be answered in the affirmative, then he is within the act, unless excluded by subheads 5 or 6 of subdivision (j) of Sec. 19."

Again, 99 Utah at page 102, 104 P. 2d at page 203,

"And in the exclusion clauses (j) (5), or perhaps more correctly the clauses making exceptions *from the general inclusion of all persons rendering personal services for wages.*" (Italics added.)

And Mr. Justice Pratt in his concurring opinion in *Logan-Cache Knitting Mills* v. *Industrial Comm.*, 99 Utah 1, 102 P. 2d 507, says:

"To me, there is no question but that this act was passed under the police power of the state; and the compensation fund * * * is merely incidental to the purpose."

(2) What are the tests of employment under the Act? This question should now never arise, for in every case under the Act that has been before this court, we have steadfastly laid down the same rules and tests. On those matters there has never been any difference of opinion in this court. All seeming differences have been in the manner of expressing our thoughts. Language, being pliable and plastic, and useful only as a means of expressing the views and thoughts of the user, vary consistently in the shades of meaning and interpretation, according to the style of expression of the user and of the reader. Every man has an affinity and preference for his own wordage, because to him it best describes his mental content, just as some men prefer suits of particular styles, shades and fabrics. The dress of the soldier, the sailor and the marine differ, but the man within is the same in purpose and action regardless of his style of dress. Members of the profession, both on the bench and at the bar, being human, are prone to look at the dress rather than the man within, and if they prefer the blue of the navy, argue that a marine or a soldier is not a defender

of America on the Seven Seas. But a tenacity to "set expressions" impels rigidity in law, formalism in social concepts, and ritualism in religion. We cannot afford to erect a legal Ramiumptum.

Counsel have devoted some considerable part of their respective briefs discussing what the court has said in prior cases about the tests as to whether any given person or situation is within the Act. In the hope of avoiding further argument about the matter we shall examine all prior decisions of this court to note again the tests there laid down. In the Globe case, supra [98 Utah 36, 91 P. 2d 514], Mr. Justice Wolfe said:

"There was no question but that Thomas *performed services for the petitioner* [Globe Co., the employer] and that *he received 'wages'* as wages are defined by Section 19(p) [Ch. 43, Laws of Utah 1937] of the act." (Italics added.)

And on the petition for rehearing, 98 Utah 48, 97 P. 2d 582, he said:

"As stated in the opinion, services performed for 'wages' as defined by the Act, with the *exception of those carved out* by a concurrence of the conditions of subsections (a), (b), and (c) of Sec. 19(j) (5) * * * make the relationships which the Act covers." (Italics added.)

There were no dissents from these statements. In the Creameries case, Mr. Justice McDonough, speaking for the court, says:

"The first question to be determined * * * is whether the applicant 'performed services for wages' for the plaintiff."

He points out that "services" and "wages" are broader than the common law definitions, because of the definitions given in the act, and then says:

"If such personal services are found to have been *performed for the employing unit*, then such [personal] service is to be deemed employment subject to the Act. But if the facts required by subdivision (a),

(b) and (c) of subsection (j) (5) are shown * * * the service of the individual is not within the terms of the Act; otherwise it is."

And again clarifying further he says:

"Having determined that Foss *performed personal services for wages for plaintiff company,* we must conclude that he is entitled to receive unemployment benefits unless the evidence shows the concurrent existence of (a), (b), and (c) of Section 19(j) (5) of the Act."

From these statements there was no dissent. Speaking through the same justice in the Tribune case, supra, the court said:

"The first question to be determined in this case is whether, under the facts, the applicant * * * was performing personal services for wages for the plaintiff herein."

He then stated the second contention:

"Even though it be determined that Cushing *was performing services for wages* for petitioner, still the conditions set out under subsections (a), (b), and (c) of Section 19(j) (5) of the Act were concurrently present *to preclude his right to receive unemployment benefits.*" (Italics added.)

That case concludes with the declaration that "having already determined that Cushing performed 'personal services for wages' for plaintiff," it follows that since conditions (a) (b) and (c) of (j) (5) did not all cooperate *to exclude him from benefits* he was entitled to receive the same.

In the Logan-Cache Knitting case, supra, Mr. Justice Wolfe, in his concurring-dissenting opinion, said:

"The individuals must bear the relationship of 'employment' as defined by section 19(j) (1); that is, must perform service for wages, or under a contract of hire."

Elaborating, he states that whether the relationship of employment exists between two parties depends on

"only whether they bear the relationship required by section 19 (j) (1)." "The question of whether the plaintiff is an 'employer' as defined by section 19 (i) (1) must be resolved by determining whether the applicant is in the relationship defined by section 19 (j) (1)."

In the National Tunnel case this question was not touched upon by any of the justices, but in Combined Metals case, supra [101 Utah 230, 116 P. 2d 934], Mr. Justice Pratt, in his dissenting opinion, said:

"The unemployment Compensation Law has laid down rules whereby we may determine whether or not a given case is one to receive the benefits of its enforcement. Those rules may be classed generally as of two kinds: (1) Those limiting the law to a certain class of relationships, and (2) those exempting from that class lesser classes. Sections 19 (j) (1) and 19 (p) are of the first kind; section 19 (j) (5) is one of the second. * * * It is clear that the provisions of section 19 (j) (5) have no bearing upon the application of sections 19 (j) (1) and 19 (p). * * * Paragraph (a) of section 19 (j) (5) is the paragraph covering 'control' as an element in determining whether or not a given service relationship is *one to be excluded* from the act. It, *however, assumes* the relationship to be one of service, whereas the question in issue here is: Is there a service relationship?" (Italics added.)

In the Fuller Brush case, as in all the others, the argument centered about section 19 (j) (5), counsel for the commission vigorously contending that any and all service for whomsoever rendered was within the Act unless excluded by section 19 (j) (5). Mr. Justice Larson, therefore, elaborated more fully than had theretofore been done on the place and purpose of section 19 (j) (5) in the Act. Yet in the case now before the court, counsel for the Commission still hark back on the same position, assails what was said in the Fuller and all previous cases about the section with the statement that in the Fuller Brush case

"the court seems to have construed Section 19 (j) (1) and (5) of the Utah law as requiring that these services must be performed *for another*, before the three tests of exclusion may be applied, and that the performance of services alone was not enough."

The court did so construe Section 19 (j) (5), not only in the Fuller case but in five preceding cases, as shown above. We quote again from the brief of counsel for the Commission:

"Under this court's construction, it is necessary, before applying the three tests of exclusion, [19(j) (5) (a) (b) (c)] to determine whether personal services are performed for the individual rendering such services or for another. What tests, however, are to be used in determining whether such services are being performed for oneself or for another? * * *

"The new concept of employment adopted by the legislature of Utah can be given full force and effect only by applying the three tests of exclusion contained in Section 19(j) (5) to an individual performing services, *irrespective of whether they be performed for another or for himself.*" (Italics added.)

It was such statements (repeated again in this case) that caused us to elaborate the matter in the Fuller case. It is difficult to conceive a service relationship with one-self. A relationship necessarily involves at least two parties, participants or objects. We repeat a statement we made in the Fuller case:

"The first question therefore to be determined, when a claimant applies for benefit payments, or when the question arises as to whether a particular individual should be included on a payroll report for purposes of determining the amount of contributions to be paid is: Has this individual rendered personal service for wages or under a contract of hire? In other words, did he render personal services? If so, did he, or was he entitled to receive therefor remuneration based upon such personal service? If both these questions be answered in the affirmative, then he is within the act, unless excluded by subheads 5 or 6 of subdivision (j) of Sec. 19. If either of these questions be answered in the negative, such person is not within the act. If the questions last above set forth be answered affirmatively, then the inquiry must be made as to exclusion by subheads 5 or 6."

Mr. Justice Wolfe, in his dissenting opinion, says the same thing in only slightly different words:

"We are now examining the record in respect to a determination of whether the relationship belongs in this service or non-service class

under 19(j) (1). We are not yet concerned with the next test which occurs under 19(j) (5) (a), (b), and (c) which must be applied if we find the relationship under 19(j) (1) to be one of service for wages."

And again discussing subdivision (j) (5) in the main Fuller opinion, we said:

"But these three factors are not given for the purpose of determining whether a certain labor performed or service rendered, comes within the term 'employment' as used in the act, nor for determining whether such labor or service is performed for 'wages' as used in the act. Subhead 5 applies only to cases, where it has been previously determined where the work or service comes within the term 'employment' as defined in the act, and that it was performed for 'wages or under a contract of hire.' Until is has been so determined subhead 5 has no application."

In the same opinion we say:

"The error came about through a misinterpretation of the law, in holding that *all* personal services were within the act unless excluded by the provisions of Sec. 19(j) (5),—whereas only those personal services are within the act which are rendered for another for wages or under a contract of hire. As pointed out above, Sec. 19(j) (5) is an exception provision, applying only after it has been determined that personal services were rendered for another for wages or under a contract of hire. It excepts from this class certain instances in which the three conditions of that section all are present."

Mr. Justice Wolfe, in his dissenting opinion approves this statement when he says in only different language:

"Sec. 19(j) (5) (c) assumes that the test of 19(j) (1) has been met so far as the claimant is concerned—that is, that the relationship is one of service for wages."

Mr. Justice Pratt in *Combined Metals* v. *Industrial Comm.*, supra, said:

"It is clear that the provisions of section 19(j) (5) have no bearing upon the application of sections 19(j) (1) and 19(p)."

As shown above this interpretation had been made by the court in five prior cases, speaking through four different justices, so it may be accepted that the court has always been, and now is, in unity upon that matter, and it seems time the Commission should accept it. We note that the Supreme Court of Missouri in the case of *A. J. Myer & Co.* v. *Unemployment Compensation Comm.*, 348 Mo. 147, 152 S. W. 2d 184, construing a provision of their statute identical with our Sec. 19 (j) (5), quoted from our Fuller case the matters quoted, supra, and upon the authority thereof gave the same interpretation to the section of their statute corresponding to our 19 (j) (5). The Supreme Court of Tennessee in *Texas Co.* v. *Bryant*, 178 Tenn. 1, 152 S. W. 2d 627, in almost identical words makes the same application of 19 (j) (5) in their statute.

The examination of these opinions reveales that the members of this court are committed to the following:

(a) The Unemployment Compensation Law was enacted under and as an exercise of the police power of the state. ■

(b) Its purpose is remedial to protect the health, morals, and welfare of the people by providing a cushion against the shocks and rigors of unemployment. ■

(c) Being remedial under the police power and not imposing limitations on basic rights, it should be liberally construed. ■

(d) "Employment" under the act is not confined to common-law concepts, or to the relationship of master and servant, but is expanded to embrace *all services rendered for another for wages.* ■

(e) The terms "employment," "personal services" and "wages" are much broader in meaning and application than their common-law counterparts, and encompass in their coverage many persons and relationships not included in the common-law relationship of master and servant. ■

(f) All situations where one rendering services for another for "wages" is under the direction and ■

control of such other in the rendering of such service, are service relationships within Sec. 19 (j) (1) of the Act.

(g) The absence of direction and control does not necessarily exclude the parties, or the relationship from the operations or scope of the Act.

(h) In determining if the relationship is within the act, the Commission and the court will look behind the contract to the actual situation—the status in which the parties are placed by the relationship that exists between them.

(i) The test is twofold: Did he render personal service for another? If so, was he entitled to remuneration (wages) therefor? If both are found, the relationship is within the Act.

(j) If the relationship is within the act, we apply Section 19 (j) (5) to determine if he is entitled to benefits, provided the claimant meets all other requirements of the Act to bring him within its provisions.

(k) Section 19 (j) (5) is an exception or exclusion section taking or sifting out from the right to receive benefits, certain persons who otherwise come within the Act, as "rendering personal services for wages" and is not a test to determine whether the relationship was a service one.

With the matter clear as to the basis for approach and determination, we will examine the record to see if the ruling of the Commission that Winget was in employment within the Act is justified by the evidence. Counsel for both parties seem to think that the case resolves itself about the opinion in the Fuller Brush case. Since there seems to be some differences of opinion as to certain statements made in the principal opinion in the Fuller case, we shall clarify some language used in that opinion which is not as clear as it should be. From what has been said heretofore in this opinion, it follows that the nature of the relationship between the parties is to be determinable upon the basis of the status in which the parties are placed by that relationship rather than upon the formal contract.

That there may be no further misunderstandings as to what the Fuller case stands for, we shall elaborate some-what upon what was there said. The writer confesses that in the interests of brevity, some steps in the rationale in the Fuller case were by him omitted from that opinion. I shall now remedy the defect by quoting parts of that opin-ion, supplying in brackets the omitted steps and explanations.

"The question as to whether one performing personal services is performing them for another or for himself usually offers no difficulty. In a few borderline cases, where services for another and for self may overlap, or where an artificial relationship may be set up between the parties, some difficulty may be encountered. It may be stated that [beyond any question] services are performed for another when performed under his supervision direction and control, in the performance of the details of the work and in the use of the means employed; (*Texas Co.* v. *Wheeless*, 185 Miss. 799, 187 So. 880) [or] when he has the right to hire (select the worker) and the right to fire (terminate the employment) and when the compensation, if any, accruing to the worker becomes a direct liability on the other party. But all these are not always present, [Is not this an equivalent of a statement that he may be in 'employment' without, 'control' or without 'the right to hire and fire' or without compensation 'being a direct liability' on the other party] and if present they may not be evident on a casual examination. Under some of the recent labor legislation, the right to hire and fire has been much limited. The right to determine and fix the compensation of the worker is indicative, although under many wage laws the compensation is fixed by law or by an administrative body, or may be determined by a contract between the employer and a third party."

Then after a statement of the facts in that case it is said:

"All the elements pointed out in the Creameries of America case and the Salt Lake Tribune case, supra, as evidencing the fact that the relationship was one of employment, are lacking in this case. [The elements pointed out as evidencing in those cases the relationship to be one of employment were: (a) the purchasers were customers of the company, not the distributor; (b) the company never relinquished its right to these customers; (c) the distributor had to furnish the company a list of the new customers; (d) the dealer could acquire no customers for himself; (e) the company paid him one dollar for each new customer he obtained; (f) retail sales price was fixed by the

company; (g) the good will of the business was reserved to the company; (h) dealer could handle no products other than those of the company; (i) upon termination of contract he could not deal with customers relative to products of such lines for two years thereafter.] The appeal tribunal and the Industrial Commission found specifically that Holst was free from all direction and control over the performance of his services, both under his contract and in fact; and that his services were performed outside the places of business of the company, but found that he received wages in the nature of commissions. Putting it briefly, they found that claimant performed personal service, that he received wages in the nature of commissions from plaintiff, and therefore such personal services must have been rendered for plaintiff. [There was no finding that the services were performed or rendered for the Fuller Brush Company. That was inferred from the finding that he received 'wages,' which would be a proper inference, if the finding that he received wages is sustained]. That claimant performed personal service is not in dispute, but there is a dispute as to whether such services were performed for plaintiff or for self, and as to whether he received wages therefor or profits on sales. [Bear in mind the commission's erroneous position as shown supra that services rendered for self were within the act.] In other words, was the relationship between plaintiff and claimant that of employer and employee or that of vendor and vendee? [The next sentence is the unfortunate and incomplete expression, which should read:] The finding being positive and definite that claimant in the performance of the personal service was free of all direction and control by plaintiff, both in fact and under his contract of hire [and since there is no finding that claimant performed or rendered any services fo the plaintiff], it must follow of necessity that he did not perform service for plaintiff under a contract of hire or for wages, and therefore the relationship was one that never came within the scope of the act because he was not [by the findings] in employment that would bring him within the act, to wit, rendering personal services for another under a contract of hire or for wages. Since there was no obligation on plaintiff to pay claimant any remuneration for services, but claimant must get his remuneration, if any, from his ability to sell the brushes at an advanced price over the cost to him and that he and not plaintiff assumed the risk of profit or loss on the venture or undertaking, it follows claimant's services were not rendered for wages or under a contract of hire."

As stated in the principal opinion, the case involved but two points: more detailed statement of the function of Section 19 (j) (5) than we had given in the prior cases;

and a determination as to whether the facts showed a relationship of service or of vendor and vendee. We held that the record as before us showed as a matter of law, a vendor-vendee relationship, and not a service relationship. The opinion certainly was not intended to overrule our former holdings, because we cited all of them as authority for our position in the Fuller case. Therefore, to say the court held that "employment" under the Act was confined to the relationship of master and servant, as meant by the common law, would be outside of any questions considered by, or discussed in, that opinion. Chief Justice Kelly of Oregon, in *Singer Sewing Machine Co.* v. *Unemployment Compensation Comm.*, 167 Or. 142, 103 P. 2d 708, 116 P. 2d 744, 138 A. L. R. 1398, correctly interpreted the Fuller case. If, as contended by counsel, the Missouri court in the Meyer case, supra, interpreted the Fuller opinion to hold that we confined the Act to the master and servant relationship, or therein made any pronouncements with respect to independent contractors, it misconceived and misinterpreted that opinion.

Having thus, we hope, bridged the quicksands of ■ uncertainty, we turn to an examination of the facts in the instant case. The contract here involved, Form 72, between the Company and the salesman provides that the salesman

"is authorized to solicit, negotiate, and effect at prices and on terms approved and authorized from time to time by the Company sales and leases of Singer Sewing Machine. * * * as may for the time being be consigned or entrusted to him for sale;"

it authorized him to collect on such Company accounts as it left or placed in his hands; that all sales or leases are subject to approval and acceptance of the Company; that leases and sales on time were to be made in the name of the Company and the papers turned over to it; that salesman make weekly reports of all business done, and remit daily all moneys collected, to pay for repair or damage to all property lost or damaged, return to the Company upon

demand any or all property not sold; he must ascertain for the Company the location of all property sold and unpaid for,

*"and to do any act or thing the Company considers necessary or advisable for the protection of its interest or protection of its rights;"* (Italics added.)

that if any time sale or leased property is repossessed he must refund to the Company any commissions received on such sale in excess of three-fourths of the cash paid by the customer and forfeit all remaining commissions on the sale or lease; the Company reserves the right to reject any sale or lease made by salesman; to allow discounts; to repossess; to collect on accounts held by salesman; that in any dispute the books of the Company shall be binding on the salesman.

Such are the provisions of the contract with respect to the service or work relationship between the parties. That the salesman performs personal services for the Company just cannot be questioned. The service relationship here is much stronger and more evident than in any previous case that has been before us. None of the matters above specified all of which tend to show a service relationship were to be found in the record in the Fuller Brush case. Each of the above terms are inconsistent with the concept of a vendor-vendee relationship. The business shows it was the Company's goods, the Company's accounts; the Company's risks of profit and loss; the Company's money; the Company's customers; the Company's good-will; the Company's salesman. Many of the services rendered by the salesman were rendered at the specific direction of, and for the Company. It was a service relationship.

Were the services performed for "wages"? The contract provides that the salesman's remuneration was in the form of commissions on sales or leases made. The commissions varied for different types of service; were not deductible by the salesman, but all moneys were sent in to the Company, and it computed the commissions and issued its check

to the salesman; that the salesman was required to refund part of the commissions received if the Company repossessed the property or if a lease was cancelled. Under Section 19p of the Act, remuneration for services rendered for another, even though in the form of commissions, is included within the term "wages." Since the salesman performed services for the Company and received, or was entitled to receive, "wages," he is within the provisions of the Act, and unless he is excluded from the receipt of benefits by the exclusionary exception provided by 19 (j) (5) he is entitled to receive benefit payments.

There is no question involved in this case as to whether the salesman is excluded from benefits by that exception provision, and under the record such question could not well be here. See, also, *Singer Sewing Machine Co.* v. *St. Unemployment Comp. Comm.*, 167 Or. 142, 103 P. 2d 708, 138 A. L. R. 1398, same case on petition for rehearing, 116 P. 2d 744, involving this same contract 72.

The order of the Commission is affirmed.

WOLFE, C. J., and McDONOUGH, J., concur.

MOFFAT, Justice.

I concur in the result. My concurrence is limited to the provision in the contract whereby Winget agreed

"to do any act that the company may consider necessary or advisable for the protection of its interests and enforcement of its right under any sale or lease effected by the second party [Winget] or with respect to any account entrusted to the second party for collection."

Otherwise, Winget in my opinion was an independent contractor under the contract and in fact as he claimed to be.

PRATT, J., on leave of absence.