LEACH et al. v. BOARD OF REVIEW OF INDUSTRIAL COMMISSION, DEPARTMENT OF EMPLOYMENT SECURITY.

No. 7751. Decided Sept. 3, 1953. (260 P. 2d 744.)

*Herbert B. Maw,* Salt Lake City, for appellants.

*E. R. Callister,* Atty. Gen., and *Fred F. Dremann,* Salt Lake City, for respondent.

WOLFE, Chief Justice.

Certiorari to review a decision of the Board of Review of the Industrial Commission affirming the decision of the Appeals Referee that the plaintiffs are liable for contributions to the Unemployment Compensation Fund on moneys paid by them to certain "franchise dealers" who solicited orders for the sale of the plaintiffs' windows and other products; also to certain "contract installers" who installed the plaintiffs' windows in buildings. The case presents for our determination whether the "franchise dealers" and "contract installers" were in the employment of the plaintiffs within the meaning of the Employment Security Act, Section 35-4-1 et seq., Utah Code Annotated, 1953.

The plaintiffs are partners engaged in the business of distributing Rusco Windows and other products manu-

factured by the F. C. Rusco Company of Cleveland, Ohio. Sales of the products are made by individuals and corporations denominated by the plaintiffs as "franchise dealers," hereinafter referred to simply as dealers, to whom the plaintiffs by agreements in writing give the exclusive right (subject to an exception not important here) to solicit orders for the sale and installation of Rusco Windows and products in a certain territory at prices fixed by the plaintiffs. The plaintiffs furnish all order forms and dealers are required to submit all orders solicited by them to the plaintiffs for acceptance within five days after procuring them. When the plaintiffs accept an order it becomes a contract between the customer and them. Dealers are precluded by their agreements with the plaintiffs from referring the orders which they solicit to any one but the plaintiffs. If a sale made by a dealer requires financing, the dealer must complete certain forms furnished by the plaintiffs giving necessary information. All credit investigations are made by the plaintiffs. Dealers receive a commission on the orders which the plaintiffs accept, the commission being usually paid after the products have been installed.

By their agreements with the plaintiffs, dealers may not handle, sell or distribute any other products, although there was testimony adduced that some dealers did, in fact, solicit sales of products not carried by the plaintiffs. The dealers work when and as they desire, pay their own expenses, hire help, if needed, at their own expense, and operate from their own homes or offices. They do, however, use the plaintiffs' office telephone as a reference in their selling activities and the plaintiffs provide a table at its office for the use of the dealers. While the dealers develop some of their own prospects, they are aided by leads furnished by the plaintiffs and placed by them in the dealers' individual mail boxes at the plaintiffs' office. Because the plaintiffs have sales and installation quotas to meet, the services of dealers who do

not produce sufficiently are terminated by the plaintiffs. Only five days' notice of termination need be given to the dealers by the plaintiffs.

Before commencing work, dealers are given training by the plaintiffs or by factory representatives to acquaint them with the products which they will sell. During their training period, the length of which depends upon their previous sales experience, prospective dealers are classed as employees by the plaintiffs and unemployment contributions are paid on their earnings.

Windows sold by the dealers are installed by persons who usually have full or part time employment elsewhere. Like the dealers, installers are given training by the plaintiffs to familiarize them with how the windows should be installed. After this training, the plaintiffs enter into a written agreement with each installer whereby the latter agrees to furnish all necessary tools and to perform the service necessary to install the products sold by the dealers in a workmanlike manner. The agreements between the plaintiffs and the installers provide that they may be cancelled on five days' notice by either party. When going on an installation job, the installer obtains at the plaintiffs' premises the windows or other products which have been fabricated by the plaintiffs or which have been received by the plaintiffs in a fabricated state. He also signs a receipt for them, and obtains a list of specifications for the installation which involves 20 points on standard jobs. After transporting the products in his own truck to the job and after installing the products pursuant to the specifications, the installer returns a completed form to the plaintiffs verifying that the materials have been installed, whereupon he is paid. The amount of payment received by the installers for the installation of windows is fixed by the plaintiffs, but on certain other jobs the installers often bid on the amount for which they will do the work. While the work of the installer is usually not inspected by the plaintiffs, they do occasionally inspect and some-

times the franchise dealer who obtained the job inspects the work to make certain that the customer is satisfied.

It is the contention of the plaintiffs that neither the dealers nor the installers were in their "employment" but that the relationship of vendor-vendee existed between the dealers and them and that the installers were "independent contractors" outside the scope of the Employment Security Act. In determining the merits of the plaintiffs' contention, the following definitions found in subsections of Section 35-4-22 of the Act should be borne in mind:

"(j) (1) 'Employment' means any service performed prior to January 1, 1941, which was employment as defined in the Utah Unemployment Compensation Law prior to the effective date of this act, and subject to the other provisions of this subsection, service performed after December 31, 1940, including service in interstate commerce, and service as an officer of a corporation performed for wages or under any contract of hire written or oral, express or implied."

"(p) 'Wages' means all remuneration for personal services, including commissions and bonuses and the cash value of all remuneration in any medium other than cash. Gratuities customarily received by an individual in the course of his employment from persons other than his employing unit shall be treated as wages received from his employing unit. The reasonable cash value of remuneration in any medium other than cash and the reasonable amount of gratuities shall be estimated and determined in accordance with the rules prescribed by the Commission; * * *."

If the dealers and the installers rendered services for the plaintiffs for wages or under a contract of hire, then the plaintiffs had persons in their employment and are liable for contributions on their wages unless those persons are excluded from the Act by the exclusion test contained in Section 35-4-22(j) (5) (A), (B) and (C), which test we will consider later in this opinion.

We find in the record competent evidence from which the Board of Review could have reasonably concluded that both the dealers and the installers were rendering ser-

vices for the plaintiffs for "wages" as that term is defined in the Act. This court held in *Creameries of America, Inc.,* v. *Industrial Comm.,* 98 Utah 571, 102 P.2d 300, 304, that the word "services" while not defined in the Act, should be given a broad meaning. Said the court, speaking through Mr. Justice McDONOUGH,

"In ordinary usage the term 'services' has a rather broad and general meaning. It includes generally any act performed for the benefit of another under some arrangement or agreement whereby such act was to have been performed."

We further stated that all remuneration payable for personal services is "wages."

The plaintiffs were in the business of fabricating, selling and installing Rusco products. To make their business successful, customers to purchase their products had to be obtained. In this endeavor, services were rendered to the plaintiffs by the dealers who solicited orders for the purchase of Rusco Windows and products. When the plaintiffs accepted an order obtained by a dealer, there arose a contract between the plaintiffs and the customer for the sale and installation of the plaintiffs' products. The plaintiffs are the sole distributors in this state of Rusco Windows and products and thus are the only persons who could accept the orders and supply the windows. The dealers by their agreement with the plaintiffs could not refer their orders to any one other than the plaintiffs. The orders were written up on forms supplied by the plaintiffs; prices for the windows were fixed by the plaintiffs, and dealers had to submit orders to them within five days after obtained. The dealers did not have legal title to the products for which they obtained orders. Title reposed in the plaintiffs. It was their products which the dealers sold, unlike the case of *Fuller Brush Co.* v. *Industrial Comm.,* 99 Utah 97, 104 P.2d 201, 129 A.L.R. 511, where this court held that certain dealers selling brushes manufactured by the plaintiff owned the brushes, and thus in selling those

brushes they were rendering service for themselves and not for the plaintiff company.

Under the definition of wages given in the Act, which definition is set out above, it is clear that the dealers' remuneration constituted wages. That the dealers' remuneration was a commission is manifest from paragraph 14 of the agreement between the plaintiffs and the dealers:

"This franchise dealer shall be entitled to a commission on any contract secured by him from customer after said contract has been approved by the distributor [plaintiffs] and after the products ordered by the customer have been installed and invoiced and the commission to be fixed by and in accordance with a discount or commission schedule maintained by the distributor at its office in Salt Lake City, Utah. The distributor agrees on written request to provide in writing to the franchise dealer the amount of commission called for on any particular contract or order secured by this franchise dealer."

The dealers were, in effect, agents who solicited orders for the sale of their principals' goods and were compensated therefor by a commission on their sales.

There can be no question but what the installers were performing services for the plaintiffs for "wages." After the plaintiffs accepted an order, they were obligated by contract to furnish and install the products. The installers performed a service for the plaintiffs which was in fulfillment of the plaintiffs' contract with the customer. When the plaintiffs needed some one to install windows, they notified one of the installers who called at the plaintiffs' place of business and obtained the windows and any other necessary materials, along with a list of specifications. After completing the job, he returned a completed form to the plaintiffs verifying that the windows had been installed and received compensation governed by a schedule formulated by the plaintiffs.

The service performed by the dealers and installers for the plaintiffs is analogous to the service found to be

rendered for the newspaper publishing company by its newspaper carriers in the case of *Salt Lake Tribune Publishing Co.* v. *Industrial Comm.*, 99 Utah 259, 102 P.2d 307. There the company was interested in seeing that its newspaper reached its subscribers and in order to accomplish that result it entered into a contract whereby a carrier was to perform the service of delivering its newspapers. Similarly, in *Creameries of America, Inc.* v. *Industrial Comm.*, supra, we held that one Foss, who was a "franchise dealer" of the plaintiff's products was rendering personal services for wages for the plaintiff in distributing those products to its customers.

Having determined then that both the dealers and the installers performed services for "wages" for the plaintiffs, we must next ascertain whether the dealers and the installers are excluded from the operation of the Act by the test posed in Section 35-4-22(j) (5) (A), (B), and (C), providing that:

"(j) (5) Services performed by an individual for wages or under any contract of hire, written or oral, express or implied, shall be deemed to be employed subject to this act unless and until it is shown to the satisfaction of the commission that—

"(A) such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of hire and in fact; and

"(B) such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(C) such individual is customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the contract of service."

It will be noted that the three requirements of the test are stated conjunctively and hence all three requirements must be met if the services rendered for the plaintiffs are to be excluded from the Act.

Assuming for the purposes of this decision that the evidence compels a finding that the dealers and installers met the requirements of both (A) and (B), there is evidence in the record from which the Board of Review could have reasonably concluded that requirement (C) was not met, i. e. that neither the dealers nor the installers were

"customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the contract of service."

In *Fuller Brush Co.* v. *Industrial Comm.*, supra, we pointed out that a shoe shiner, an auto mechanic, a plumber and a barber meet this requirement because the services which they perform emanate as a part of a business in which they are engaged. They perform services for others while in the pursuit of a business independently established and in which they are customarily engaged and for which service, like a common carrier, they hold themselves out to perform. The plaintiffs urge that each dealer was customarily engaged in the independently established business of salesmanship. This contention is untenable. Requirement (C) contemplates that the service rendered is a part of, and is rendered in pursuance of, a business of the person rendering the service, independently established, in which that person is customarily engaged. In other words, the "independently established business" must exist independent of the services under consideration in the sense that it is the whole—of which the particular service is a part. In *Fuller Brush Co.* v. *Industrial Comm.*, supra [99 Utah 97, 104 P.2d 203], it was stated:

"Plaintiff contends that the provision [requirement C] refers wholly to the service involved, and argues that if in rendering such service, claimant was acting for himself he was engaged in a business of his own, and therefore during such employment was customarily engaged in an independently established business. The difficulty with this position is that it ignores entirely the significance of the words 'customarily' and 'independently.' The statute does not say, as the

Colorado court read it in *Industrial Comm.* v. *Northwestern Mutual Life Ins. Co.*, 103 Colo. 550, 88 P. 2d 560, 'independently engaged in an established business,' * * *. The adverb 'independently' clearly modifies the word 'established,' and must therefore carry the meaning that the 'business' or 'trade' was established independently of the employer or the rendering of the personal service forming the basis of the claim. And in the exclusion clauses (j) (5), or perhaps more correctly the clauses making the exception from the general inclusion of all persons rendering personal services for wages, the present tense 'is' indicates the employee must be engaged in such independent business at the time of rendering the service involved. 'Customarily' means usually, habitually, according to the customs, general practice or usual order of things, regularly."

By their agreements with the plaintiffs, dealers were not allowed to sell products not carried by the plaintiffs, although there was testimony that some dealers did not in fact abide by this restriction. However, it is not enough that the dealers may have other sources of income. In selling such other products the dealers were not pursuing an independently established business, but rather working under contract of employment with other parties. The dealers paid nothing for their franchises or dealerships. They were prohibited by their agreements with the plaintiffs from assigning their franchises to any one else. The risk of profit and loss was all in the plaintiffs. Selling for the plaintiffs was the only or at least the main business of the dealers, if indeed it can be called a business. They had nothing aside from their relationship with the plaintiffs. When the services of a dealer were terminated by the plaintiffs, he became unemployed and had to secure employment elsewhere. He had no business of his own to fall back on—a business established independently of his relationship with the plaintiffs and from which his services for the plaintiffs emanate, a business in which he was customarily engaged aside from his relationship with the plaintiffs. The dealers' occupation was selling, but they had no independently established business as do brokers or commission merchants. None of the dealers

held themselves out to the public as operating a sales agency.

In holding that the dealers do not satisfy requirement (C), we are supported by two cases heretofore decided by this court on this point. In *Globe Grain & Milling Co.* v. *Industrial Comm.*, 98 Utah 36, 91 P.2d 512, one Thomas was engaged in soliciting orders for sheep pellets prepared by the plaintiff. Like the dealers in the instant case, Thomas was restricted to a certain territory and took orders on company forms. The only other remunerative work which he did during the period of time that he was selling pellets was to sell a car of corn for a party in Nebraska and to refer to one Maxfield, a dealer or broker in feed, customers to whom he was unable to sell. There was also evidence that Thomas attempted to sell insurance when the pellet selling business was slow. This court upheld a determination by the Commission that the evidence did not satisfy requirement (C). Thomas's occupation was selling. He had sold insurance before becoming employed by the plaintiff. But he was not at the time of his employment with the plaintiff customarily engaged in an independently established trade, occupation, profession or business.

In *Creameries of America, Inc.* v. *Industrial Comm.*, 98 Utah 571, 102 P.2d 300, 306, one Foss entered in a contract called a "franchise agreement" with the plaintiff in which Foss was given the exclusive right to sell its products at retail in a defined area. We sustained findings by the Commission that there existed a service relationship between Foss and the plaintiff and that Foss was not customarily engaged in an independently established trade, occupation, profession or business. In regard to the latter finding, this court stated that after the termination of the "franchise agreement" Foss had

"*nothing,* except what credits he might have as a result of obtaining new customers for the company, or what bills he might have outstanding." (Emphasis added.)

What we have said in regard to the dealers applies equally as well to the installers. Their situation differs from the dealers only in that a small fraction of their time was consumed in rendering services for the plaintiffs whereas the dealers spent almost all, if not all, their working time performing services for the plaintiffs. However, this difference does not strengthen their case insofar as meeting requirement (C). The evidence reveals that two of the installers were regularly employed by the Kennecott Copper Company, one by the United States Smelting & Refining Company, one was a salesman, and another's occupation was unknown. It is readily apparent that because the installers were so employed, their services which they rendered for the plaintiffs did not emanate from any independently established business in which they were customarily engaged. To the contrary, they were customarily engaged in employment elsewhere for other employers. None of them were licensed contractors or self-employed carpenters or craftsmen.

Both the plaintiffs' agreements with the dealers and with the installers specified that the dealers and installers were independent contractors and not agents or employees of the plaintiffs. A similar provision was contained in the "franchise agreement" under consideration in *Creameries of America, Inc.* v. *Industrial Comm.,* supra. Such provisions, however, are ineffective in keeping an individual without the purview of the Employment Security Act when by his activity he brings himself within—just as parties sharing profits cannot avoid becoming partners with its attending legal liability despite any agreement which they make to the contrary.

The decision of the Board of Review of the Industrial Commission is affirmed. Each party to bear its own costs.

McDONOUGH and WADE, JJ., concur.

CROCKETT, Justice.

I concur, but note a problem which arises under the statute[1] in question.

It has long been established that whether one rendering service for another is covered by the unemployment compensation does not depend upon any common law concept of master and servant or independent contractor relationship, —the law defines classes of individuals covered and it is only to the definitions in the act that we look to determine who is included.[2] The purpose of the Act was to stabilize the economy and decrease the burdens of unemployment.[3] These matters are well settled and are effectively covered in the main opinion.

The right to coverage by unemployment compensation presumably is based upon the relationship existing between the individual who hires and the one rendering service; their mutual rights and duties being measured by the contract between them. But under test "C" upon which the main opinion is based, coverage is made to depend upon a circumstance entirely extraneous to the contract of service: that is, it depends upon what the "employee" does at other times, which seems to be entirely unrelated to, and has nothing whatsoever to do with the contractual obligations or the manner in which the service is rendered.

It appears to me that the foregoing gives rise to a question as to whether the application of the statute results in unjust discrimination as between employees which fall into different classes solely because of (C) of (J) (5)

---

[1] 35-4-1 et seq., U.C.A. 1953.

[2] *Singer Sewing Mach. Co.* v. *Industrial Comm.*, 104 Utah 175, 134 P. 2d 479. Auth. there cited.

[3] *Ibid.*

referred to in the main opinion which specified that a person hired who is

"customarily engaged in an independently established trade * * * of the same nature as that involved in the contract of service. * * *."

is not covered.

Illustration: Suppose A and B work for Leach under the identical contract; that A is also employed by X Company in other type of work; that B has an independently established business as an "installer," builder, or contractor. Under this statute A would be covered while B would not.

There are these separate facets of discrimination:

1. In case of layoff A gets paid unemployment compensation benefits, while B does not.

2. A will suffer disadvantage in getting hired on the job because the employer will more readily hire B for whom such contributions need not be made.

There is also a limitation upon the employer's freedom to choose between A and B upon their merits because of the economic advantage to be gained by hiring B instead of A.

It is appreciated that there may be a discrimination between classes of individuals if there is some reasonable basis for differentiation between them which is related to the purposes sought to be accomplished by the act and it applies uniformly to all persons within the class.[4] I am not sure that I see that the differentiation brought about by paragraph (C) above referred to can be said to fulfill that requirement. Sparing the detail here, it seems that there are as good reasons why B should be paid as there

[4] *State* v. *Mason*, 94 Utah 501, 78 P. 2d 920, 117 A.L.R. 330; *Hansen* v. *Public Employees Retirement System*, 122 Utah 44, 246 P. 2d 591.

are that A should, and that A should be as able to get hired as B, consistent with the purpose of relieving the hardship of unemployment and stabilizing the economy.

So far as I have discovered, this problem has not been considered by this court in any of the cases dealing with this statute; it is not raised, nor passed upon in this case. I therefore concur in the opinion of Chief Justice WOLFE.

HENRIOD, J., dissents.